Appeal from Third District

## JONES v. MOORE et al.

No. 3869.   Decided January 6, 1923.   Rehearing denied March 9, 1923.   (213 Pac. 191.)

1. NEW TRIAL—SUCCESSOR OF TRIAL JUDGE NOT WHOLLY DEPRIVED OF EXERCISING DISCRETION IN PASSING ON MOTION FOR NEW TRIAL. In passing on a motion for new trial, there is some discretion vested in the judge to whom the motion is presented, and, where it is submitted to the successor of the judge who tried the cause, he is not wholly deprived of so exercising discretion.

2. HABEAS CORPUS—LEGALITY OF RESTRAINT ONLY SUBJECT OF INQUIRY. In habeas corpus proceedings, nothing is inquired into except the legality of the restraint.

3. HABEAS CORPUS—INQUIRY AS TO QUESTION OF CUSTODY OF CHILD IS EQUITABLE PROCEEDING. A proceeding in habeas corpus, where the sole issue involved is who shall have the custody, care, and education of a child, is equitable in the highest degree.[1]

4. HABEAS CORPUS—SUCCESSOR TO JUDGE HEARING MOTION FOR NEW TRIAL IN QUESTION OF CUSTODY OF CHILD CAN PASS ON EVIDENCE. A proceeding in habeas corpus to determine the custody of a child is an equitable proceeding, and the successor to the trial judge in passing on a motion for new trial can pass on the evidence, and is not limited to determination of whether there was substantial evidence in support of the findings of his predecessor.

5. HABEAS CORPUS—SUPREME COURT, IN REVIEWING JUDGMENT OF TRIAL COURT ON ISSUE OF CUSTODY OF CHILD, IS REQUIRED TO EXAMINE EVIDENCE. On appeal from judgment granting custody of a child, the Supreme Court is required to examine the evidence, and, if it determines that the findings are clearly against the evidence, they cannot prevail.

6. PARENT AND CHILD—IN DETERMINING QUESTION OF CUSTODY, "BEST INTERESTS" OF CHILD IS DETERMINING FACTOR. In determining the question of custody of a child, its best interests is the controlling factor, and "best interests" has reference more

[1] *Stanford* v. *Gray*, 42 Utah, 229, 129 Pac. 423, Ann. Cas. 1916A, 989; *Hummel* v. *Parrish*, 43 Utah, 373, 134 Pac. 898; *Harrison* v. *Harker*, 44 Utah, 541, 142 Pac. 716; *Farmer* v. *Christensen*, 55 Utah, 1, 183 Pac. 328; *Kurtz* v. *Christensen*, 61 Utah, 1, 209 Pac. 340.

particularly to the moral welfare than to mere comforts, benefits, or advantages that wealth can give.

7.   PARENT AND CHILD—PRESUMPTIONS RESPECTING RIGHTS OF CUSTODY OF CHILD IN PARENTS' FAVOR. Unless a parent has by his acts and conduct in some way forfeited or lost the right to custody of his minor child, the presumptions respecting his rights to have such custody are all in his favor.

8.   PARENT AND CHILD—EVIDENCE HELD TO SHOW NO FORFEITURE BY FATHER OF RIGHT TO CUSTODY OF CHILD. In a proceeding to determine question of custody of an infant child between its father and maternal grandparents, evidence *held* to show no forfeiture or loss of the father's right to have custody, control, and education of his child.

Appeal from District Court, Third District, Summit County; *Wm. M. McCrea,* Judge.

Petition by Alfred Marlowe Jones for writ of habeas corpus to obtain the custody of his infant child against Wm. Moore and another. From a judgment awarding custody to petitioner, defendants appeal.

AFFIRMED.

*P. W. Spaulding,* of Evanston, Wyo., and *D. N. Straup* and *H. Van Dam, Jr.,* both of Salt Lake City, for appellants.

*P. H. Neeley,* of Coalville, and *Dey, Hoppaugh & Mark,* of Salt Lake City, for respondent.

FRICK, J.

On May 7, 1920, the plaintiff filed his petition in the district court of Summit county for a writ of habeas corpus to obtain the custody of his infant child. He alleged in his petition that said child was restrained of its liberty by the defendants, setting forth in detail the facts in that regard. A writ of habeas corpus was duly issued, to which the defendants made return in the form of an answer, in which

they also set forth the facts respecting their custody of the child.

A trial to the court resulted in findings of fact and conclusions of law in favor of the defendants. Pursuant to the aforesaid findings of fact and conclusions of law the court entered judgment awarding the custody and control of said child to them. A motion for a new trial was filed in due time by the plaintiff, in which one of the grounds for granting a new trial was insufficiency of the evidence to sustain the court's findings of fact. While the motion for a new trial was pending, the term of office of the Hon. P. C. Evans, the district judge who tried the case, expired, and he retired from office. Counsel for the respective parties then entered into a stipulation, whereby it was agreed that Hon. Wm. M. McCrea, who was elected as district judge to succeed Hon. P. C. Evans, should pass upon and determine the motion for a new trial. Hon. Wm. M. McCrea, after due consideration, granted the motion, and ordered the cause to be retried. Counsel for both parties then entered into another stipulation, whereby it was agreed that Hon. Wm. M. McCrea, as judge of the district court, without hearing the evidence, should consider and pass upon the same as it had been produced at the trial before Hon. P. C. Evans, and that upon the evidence he should make findings of fact and conclusions of law and enter judgment in accordance therewith. Judge McCrea, as judge of the district court, then made findings of fact and conclusions of law in favor of the plaintiff, and entered judgment awarding the custody and care of said child to him. The defendants appeal from that judgment, and present the record, including all of the evidence, to this court for review.

A number of errors are assigned in which the findings of fact, conclusions of law, and judgment are assailed. It is also insisted that the district court erred in granting the plaintiff's motion and in denying defendants' motion for a new trial.

We shall first consider the assignment that Judge McCrea,

who passed upon plaintiff's motion for a new trial, erred in granting that motion.

· Counsel urge that in view that Judge McCrea did not hear the witnesses testify nor observe their demeanor or conduct while testifying, for that reason he could not determine the weight or effect to be given to their testimony. In this connection it is strenuously urged that the rule so often announced by this court should prevail, namely, that in law cases, where there is any substantial evidence in support of the findings of the trial court, the reviewing court will not interfere with the findings. It is further insisted that the district court, in passing upon the plaintiff's motion for a new trial, merely acted in the capacity of a court of review.

The rule contended for, in our judgment, should not be applied in a case like the one at bar. In granting or denying a motion for a new trial there of necessity must be some discretion vested in the judge to whom the motion is presented. While it may be that in cases where the motion for a new trial is submitted to the successor of the judge who tried the cause great care should be exercised by the judge in passing upon the motion, yet he is not, and in the nature of things cannot be, wholly deprived of exercising some discretion in granting or denying the motion. Under such circumstances the successor acts, not merely as a reviewing court, but the law clothes him with all the powers of a trial court in the premises, and, however cautious he should be in considering the motion, he nevertheless, must exercise some discretion in the matter. The question, however is: Can a case like the one at bar be treated as a law case merely?

While it is true that the proceeding, in form at least, is habeas corpus proceeding, it is, however, so merely as a matter of convenience to the parties and to expedite a hearing upon the issues. No case involving the custody of minor children has ever been tried or considered in this jurisdiction as merely a habeas corpus proceeding, although the case in form is such. In habeas corpus proceedings nothing is inquired into except the legality of the

restraint, and if it be found that the petitioner is ille-
gally deprived of his liberty, but one conclusion is permis-
sible, and that is that the same must be restored to him.
Where, as here, however, the sole issue involved is who shall
have the custody, care, and education of a child, and espe-
cially one of tender years the inquiry extends far beyond the
ordinary issues involved in a habeas corpus proceeding.
Cases like the one at bar partake of all of the incidents of
a proceeding in equity. Indeed, under our procedure, it has
become a proceeding which is equitable in the highest
degree, as clearly appears from the decisions in all of    **3**
the cases decided by this court, where the right to the
custody, nurture, care, and education of children was the
controlling issue. See *Stanford* v. *Gray*, 42 Utah, 229, 12
Pac. 423, Ann. Cas. 1916A, 989; *Hummel* v. *Parish*, 43 Utah,
373, 134 Pac. 898; *Harrison* v. *Harker*, 44 Utah, 541, 142
Pac. 716; *Farmer* v. *Christensen*, 55 Utah, 1, 183 Pac. 328;
*Kurtz* v. *Christensen*, 61 Utah 1, 209 Pac. 340. In view
of the equitable nature of the proceeding, this court, in *Har-
rison* v. *Harker*, supra, held that the rule applicable in
equity cases prevails, namely, that this court must examine
into the evidence, and, in case, the findings of the trial court
are clearly against the evidence, they will not be upheld. In
every case of this character that has come before this court
during the past 17 years while the writer has been a member,
the proceeding has always been considered and treated as
equitable. The mere fact that such cases are commenced
under the habeas corpus statute in order to expedite a speedy
hearing and determination of the case cannot alter the issues
involved nor the nature of the proceeding. Moreover, from
time immemorial the chancellors and not the law courts have
determined the controversies respecting the care, nurture,
education, and custody of minor children. The technicali-
ties of the law must therefore give way to the more im-
portant questions, all of which appeal most strongly to the
conscience of the chancellor. To that effect are all of the
decisions. There is therefore—there can be—no merit to the
contention that these cases should be treated merely as law

cases, and that Judge McCrea, as successor to Judge Evans, and while acting as judge of the district court, had no power to do more than merely determine whether there was any substantial evidence in support of the findings of Judge Evans. The assignment, therefore, that Judge McCrea erred in granting the plaintiff's motion for a new trial, for the reasons stated, cannot prevail.

Nor is the contention tenable that this court may do no more than determine whether there is any substantial evidence in support of the findings of Judge Evans. For the reasons hereinbefore stated this court, in cases like the one at bar, is required to examine into the evidence, and, if, after doing so, it determines that the findings are clearly against the evidence, the findings cannot prevail.

The next error assigned is that the district court erred in denying appellants' motion for a new trial. In view that that question is necessarily involved in passing upon the evidence and in determining the correctness of the district court's findings and conclusions, we shall not discuss the assignment separately, but shall consider it in connection with the question as to whether the findings made by Judge McCrea are supported by the evidence.

The real question for determination, therefore, is: Who is entitled to have the care, custody, and control of this child, the plaintiff, who is its father, or the defendants, who are its grandparents?

The law in this jurisdiction respecting the right of a parent to the custody, control, and education of his minor child, and how such right may be forfeited or lost, is well settled. In his concurring opinion in *Harrison* v. *Harker*, supra, Mr. Justice Straup, in considering this subject, made the following observations:

"Much is said concerning the law of the case, and that the welfare of the child is of primary consideration. The doctrine, when properly understood and applied, may be conceded. The presumption is that parents are fit and suitable to be intrusted with the care and custody of their child, and that its interests and welfare are best subserved under their care and control. Before their legal

right to its custody will be denied or invaded by the court, I think it must be made to appear that they in some manner have legally surrendered or forfeited such right or abandoned the child, or are morally unfit to have its custody, or are unable to properly provide for it in their own style and station in life. So when it is said that in determining a disputed custody of a child the primary considera-tion is its welfare, such statement should be considered in connection with the above propositions. For I do not think any one will seriously contend that, as against a stranger, a parent's legal right to the custody of his child will be denied him where an abandonment or a forfeiture, or laches, or a legal surrender, or unfitness, or inability of the parent is not clearly shown."

The same thought is expressed in different language in *Stanford* v. *Gray*, and again in *Farmer* v. *Christensen*, supra. True it is that in all of the foregoing cases the question respecting the best interests of the child is always kept to the front, and where there is any question respecting the parent's moral fitness, or where by his conduct or acts he has forfeited or lost his legal right to custody as a parent, or has abandoned the child, but desires to reclaim its custody, the best interests of the child is held to be the controlling or determining factor in the case.

Lest we be misunderstood, we again desire to stress the fact that by "best interests" of the child is not meant that because a person who claims the right to custody of another's minor child can prove that he is possessed of wealth, and that by reason of that he is better able than the parent would be to rear the child in ease and comfort, and that he can give it all the advantages of a technical or higher education, and for these reasons the best interests of the child would necessarily be subserved, and hence that issue must be determined in his favor.

Without now pausing to go into the question of what may be involved within the term "best interests," it must suffice to say that that term as it is understood and applied in cases like the one at bar has reference more particularly to the moral welfare than to mere comforts, benefits, or advantages that wealth can give. If such were not the case, poor parents could not sustain their right to the custody of a child in which a rich man has taken a special interest, and where be-

tween himself and the child there exists a strong liking or affection. It is the comparatively poor and not the rich parents who rear the large families and who give to the world a large majority of the men and women who conduct its affairs. Unless, therefore, a parent has by his acts and conduct in some way forfeited or lost the right to custody of his minor child the presumptions respecting his right to have such custody are all in his favor. If the cases of this character heretofore decided by this court are critically examined, it will be found that such is the spirit that pervades all of them.

No hard and fast rule with respect to what may be considered the best interests of a child can, however, be laid down to govern in all cases. Each case must be determined upon its own peculiar facts and circumstances.

The case of *Kurtz* v. *Christensen,* supra, is a strong case, where the parents were morally not unfit, yet where they had forfeited their right to the custody of their own child by reason of their acts and conduct through which undeniable equities had grown up in favor of the foster parents. *Farmer* v. *Christensen* affords another illustration where a parent had to yield the custody of his own child to another because it was deemed for the best interests of the boy in that case.

The questions, therefore, are: First, has the plaintiff by anything that he has either said or done forfeited or lost his primary right as a parent to have the custody and control of his child? and second, is he morally unfit to have the care, custody, control, and education of his child, or is he entirely without means to support the child, and for that reason it is in danger of becoming a public charge—that is, a mere pauper?

The facts in this case as disclosed by the evidence are very simple, more so in fact than is usual in this class of cases. We shall, at the very threshold of the inquiry, entirely eliminate the question concerning the moral fitness of both the plaintiff and the defendants, and, for the purposes of this decision, shall assume that either the father or the grand-

parents are morally fit to have the custody of the child in
question. That question being thus eliminated, the next
inquiry is, Has the plaintiff by anything he has said or done
forfeited or lost his parental right to have the custody, con-
trol and education of his child?

We shall not pause to state the evidence in extenso. No
good purpose could be subserved by doing so. We shall
therefore merely state our conclusions from the evidence, but
in the course of the opinion shall call attention to a few of
the more important statements only which were made at the
trial by some of the principal witnesses. The salient facts
are that the plaintiff was married to the daughter of the
defendants in 1915. A daughter was born to them, and in
the fall of 1918 the three lived happily and comfortably in a
modern cottage, equipped with all the conveniences of a
modern home in Echo, a small town on the Union Pacific
Railroad in Summit county, this state. Early in November,
perhaps late in October, 1918, the plaintiff was afflicted with
the influenza, which was then epidemic in this state, and
the disease resulted in pneumonia. His wife waited on him,
when she, too, was afflicted with the disease, and she con-
tracted what in the record is termed double pneumonia. In
her case the disease was very virulent, and in consequence
she, on the 7th day of November, gave premature birth to a
child, which is the child in question. At the time the child
was born there were two women waiting on the husband and
wife, and immediately after the child was born another
woman, a professional nurse, came to specially wait upon the
sick wife. There were therefore three women in attendance,
while plaintiff's parents lived only about fifty feet from his
home. Plaintiff's mother, it seems, prepared what food was
necessary in her own home, and brought it to those who were
in attendance in plaintiff's home. A doctor was also in at-
tendance, but he was not present at the time the child was
born, but came after, and gave directions with respect to its
nursing and care, which directions one of the women in at-
tendance undertook to carry into effect. In view of the
exceedingly contagious nature of the disease with which the

plaintiff and his wife were infected, the women in attendance were fearful that the child, to which the mother had given birth as aforesaid, might become infected also, and for that reason they kept the child in the kitchen away from those who were ill. The plaintiff's wife as before stated, was desperately ill. She was at one end of the cottage in a bedroom in which, under the directions of the doctor, the doors and windows were constantly kept open to keep the room cold, while the plaintiff, with his other child, was in a chamber at the other end of the cottage. By that time plaintiff's fever was broken, and he was recovering from the influenza and the pneumonia, but he still remained weak and in bed. After the child was born it seems that various suggestions were made respecting its care. The professional nurse who was in attendance on plaintiff's wife suggested that the newborn babe be given into the custody of its grandmother, who was the mother of plaintiff's wife. After some discussion it was deemed safer to have the child away from the house where those afflicted with the influenza were being kept, and in view that the child was prematurely born the women in attendance had some difficulty in feeding it. The grandmother at the time was nursing her youngest child, seven months of age, and, after considering the matter with the mother of the child, the plaintiff's sick wife, it was deemed best to place the infant in the custody of the grandmother, although she had four other children in her family.

At this point there is some conflict in the evidence. Defendants assert that the mother of the infant expressed a desire to have the grandmother take and rear the child, in fact both children, and that the plaintiff consented to such arrangement, while he strenuously denies that he agreed to any such arrangement, but insisted that the child should remain at his home. Be that as it may, the child was taken by the grandmother while its mother was very dangerously ill. Within two days after the child was born and after it had been taken away by the grandmother and her husband, who lived some three miles distant from plaintiff's home, the mother of the child died. There is considerable contro-

versy respecting what was said by the different actors in this domestic tragedy, including the plaintiff, respecting the further custody of the child. Upon a critical examination of the evidence, however, and especially that which relates to the period of time when the child was born and was taken by the defendants, we are forced to the conclusion that no permanent arrangement was made, nor intended to be made, respecting the future custody and control of the child. With respect to that matter the grandfather, one of the defendants, as appears from the bill of exceptions, after stating that in taking the child "I had an idea that in taking the baby away we would be permitted to raise it," further testified:

"Q. Did you have any idea of taking that baby so that it would be one of the William Moore family and not of the Marlow Jones family? A. Not at that time, but later I did. Q. When did you start to form that opinion? A. I don't know. Q. It has just been a matter of growth, has it not, Mr. Moore? A. I don't know. Q. It has just been a matter of growth, has it not, Mr. Moore? A. I don't know. Q. You did not form it at the time the baby was christened? A. In a way I did."

Again, with respect to the same matter, the grandmother, the other defendant, testified:

"Q. Now, Mrs. Moore, when you first took this child you never had any intention or idea of absolutely depriving Mr. Marlow Jones of it? A. No, sir. Q. That has been an afterthought, has it? A. I took the child, and I got that fond of it. I let her nurse, and now I could not stand to think for a minute of parting with the child. Q. You took the child to save its life? A. Yes, sir. Q. And not for the purpose of depriving Marlow Jones of its custody? A. No, sir. Q. That has been an afterthought of getting the child permanently, the growth of affection? A. Yes, sir. Q. So that to-day you want the child? A. Yes, sir. It would kill me if the child is taken away from me."

In view of the foregoing statements by the defendants the conflict in the evidence hereinbefore referred to, and as it appears from the entire record, is of no controlling consequence, and may be laid out of consideration altogether.

It further appears from the testimony of these witnesses that in some way the grandmother had acquired a strong feeling of resentment against the plaintiff,, which she freely

admitted might affect her testimony. The same is true of the professional nurse, on whose testimony the defendants rely.

It is therefore reasonably clear from the testimony of both the grandparents, who are the claimants and defendants here, that there was no arrangement, much less any definite arrangement, entered into between the plaintiff and defendants respecting the permanent custody of the child. No doubt the dying mother expressed a desire that the grandmother should rear the child—indeed, as before stated, both children. That is but natural, but cannot affect either the plaintiff's duty or his right respecting the care and custody of the child.

A careful reading of the whole evidence also forces the conclusion that the grandmother's interest in and affection for the child grew upon her from day to day until she became obsessed with the thought that she should retain its custody and rear it as her own. Neither is there any doubt that the grandmother saved the child's life, and that she, by her untiring and motherly efforts and care, has caused it to develop into a strong and healthy little girl. She acted most humanely, and made every sacrifice that it was possible to make to save the child's life, but she acted but the part of a human being. In view that she succeeded in saving the child's life she now strongly feels that she at least should be entitled to be rewarded by obtaining what comfort she may from the companionship and close contact and affection of the child whose life she saved. If the grandmother's wishes were all that we were required to consult or consider, there would be but one conclusion permissible. We can, however, not lose sight of the rights of the father to rear his own child in his own family and to direct its education and moral training. Nor can we ignore the rights of the child to be a member of the father's family, to be with her little sister, and ultimately to reap the fruits of that relationship, whatever they may be.

Nor does the fact that this action was not commenced until about 18 months after the birth of the child militate against

plaintiff's rights. The plaintiff remarried in November, 1919, about a year after the death of his first wife. Immediately after, if not before, his marriage, he expressed a strong desire to have the custody of the child and to have her grow up in his family with his other little girl, the child's sister. The evidence is to the effect that both the plaintiff and others who interceded in his behalf sought for an amicable settlement of the respective claims of the parties and to have the custody of the child restored to the plaintiff. The defendants were, however, unyielding, and refused all overtures for an amicable adjustment, and hence this action was delayed for some months. We speak of this only to show that the mere lapse of time is of little consequence in this case.

Then again it is asserted that the plaintiff practically abandoned the child to its own fate, in that he did not visit it often and did not provide for it or show any concern respecting its welfare. As before stated, the grandmother freely admitted that she had formed a strong dislike to the plaintiff at about the time of the death of plaintiff's first wife, which, instead of becoming tempered as time passed, seemingly grew stronger. The grandmother, however, admits that for the first six months or so after plaintiff's wife had died he, as she puts it, often came to visit and to see the child. Plaintiff's explanation respecting his conduct in that regard is most natural and probable. It is that owing to the strong aversion of the defendants, and especially the grandmother, he was in effect compelled to remain away from their home and hence from seeing the child.

The evidence further discloses that plaintiff's home is superior to that of the defendants' home; that his means and property rights are, to say the least, equal, if not superior to, theirs, and that he has married a very estimable woman, who is a nurse and of about the same age he is, and who had become a widow through the death of her husband. She testified that she was anxious to have the children together in one family, and that she was willing to rear them and to give them all the advantages due to their station in life.

Without extending this discussion, it must suffice to say

that we have viewed this record from every possible angle, and after doing so have been unable to find anything which would justify this court, or any court, in setting aside the findings of fact and conclusions of law as made by Judge McCrea as judge of the district court. The judgment of the district court therefore should be, and it accordingly is, affirmed at defendants' cost.

WEBER, C. J., and GIDEON and THURMAN, JJ., concur.

For the reasons that the term of office of the Hon. E. E. CORFMAN, who was Chief Justice, expired after the presentation and submission of the foregoing case at the October, 1922, term, and that the opinion was filed after his retirement, his name is omitted from the opinion.

### On Application for Rehearing.

FRICK, J.   Appellants' counsel have filed a petition for rehearing, in which they vigorously assail the conclusions reached by this court in the opinion filed in this case.   Counsel, however, although at great length, merely reargue the questions that were argued in their original briefs and 'which have been passed on by this court.   Ordinarily, therefore, the petition for a rehearing would be denied without further comment, for the reason that it is not enough to merely reargue the propositions that have been considered and decided. In view, however, that counsel in their argument filed in support of their petition for a rehearing again assail and more fully argue the right of the district judge who heard the motion for a new trial, but who is merely the successor of the judge who tried the case, to exercise a reasonable judicial discretion in granting or denying a new trial, we shall merely cite the authorities upon that subject without discussing them.

The question under a statute like ours has frequently come before the Supreme Court of California, and it has uniformly been held by that court that the judge passing upon the motion for a new trial, although he is merely the successor

of the judge who ·tried the case, nevertheless, must exercise a sound legal discretion in the matter. In the Case of *Altschul* v. *Doyle*, 48 Cal. at page 536, the court, after stating the general rule respecting the exercise of judicial discretion in granting or denying a motion for a new trial, says:

"The circumstances, that intermediate the trial and the determination of the motion for a new trial, a change in the incumbency of the bench in the court below had occurred, and that the motion was determined by the new incumbent, who had not presided at the trial, can make no difference in the application of the rule. The consideration, in the first instance, of the question, as to whether or not the decision upon a substantially contested issue of fact is satisfactory to the judicial conscience, is a function of the trial court as such; its determination by that court is entitled ·to the utmost degree of deference at our hands; and upon looking into the record in this case, we find no reason to disturb the conclusion arrived at below."

To the same· effect are the opinions in *Macy* v. *Davila*, 48 Cal. 646; *Wilson* v. *California, etc., Co.*, 94 Cal. 166, 29 Pac. 861, 17 L. R. A. 685; *Austin* v. *Gagan*, 3 Cal. Unrep. Cas. 533, 30 Pac. 790; *Texas & P. Ry. Co.* v. *Voliva*, 41 Tex. Civ. App. 17, 91 S. W. 354; *Van Giesen* v. *Queen Ins. Co.*, 132 Ga. 515, 64 S. E. 456.

The foregoing cases all sustain the rule announced in the opinion, and we are ·not aware of any cases to the contrary under statutes like ours.

It is next insisted · that in determining the rights of the plaintiff as the father of the child under the circumstances of this case we laid too much stress upon certain portions of the evidence. In passing upon that question we were very careful to determine the rights of the defendants upon their own statements made under oath. We know of no rule, either of law or of morals, that forbids a court from judging a party according to his own statements when such statements are deliberately made under oath and with a full appreciation of what they purport to establish. That is all we did in passing upon the effect of the evidence in this case.

In conclusion, and without entering upon further argument, we desire to state that the case in all of its phases has received most careful consideration, and, after having given

the matter our best judgment, our convictions force us to the conclusions stated in the opinion; and, after again reflecting upon the matters involved, we are still convinced of the correctness of our conclusions, and that they should prevail.

The petition for a rehearing is denied.

WEBER, C. J., and GIDEON and THURMAN, JJ., concur.