## JENSEN v. EARLEY et al.

No. 4161.   Decided July 17, 1924.   (228 Pac. 217.)

1. APPEAL AND ERROR—PARENT AND CHILD—PETITION TO RECLAIM CHILD SHOULD DESIGNATE PARTIES PLAINTIFF AND DEFENDANT; SUPREME COURT MAY CORRECT PETITION. Title to mother's petition to reclaim a child from persons detaining it should designate the mother plaintiff and persons against whom brought defendants, and the Supreme Court may correct it to so designate them.

2. BASTARDS—MOTHER'S PROCEEDING FOT CARE AND CUSTODY OF ILLEGITIMATE CHILD HELD HIGHLY EQUITABLE. Minor mother's proceeding for care and custody of illegitimate child against

strangers to whom plaintiff's doctor delivered it under arrangement with plaintiff's mother held highly equitable.[1]

3.  BASTARDS—BEST INTERESTS OF ILLEGITIMATE CHILD BETWEEN
    MOTHER AND STRANGERS IN POSSESSION HELD QUESTION OF LAW.
    In minor mother's proceeding against strangers for care and
    custody of illegitimate child delivered to them by plaintiff's
    doctor at birth, both defendants and plaintiff's parents being
    morally and physically fit to have care and custody, best interests of the child *held* a question of law, presumption favoring the mother.[2]

4.  PARENT AND CHILD—PARENT GENERALLY HAS RIGHT TO CUSTODY
    OF CHILD.  Other things equal natural parent is entitled to care
    and custody and control, but may by agreement or conduct
    deprive herself of such right, the guiding principle always being
    the child's best interests.[3]

5.  BASTARDS—MOTHER'S UNMARRIED STATE HELD IMMATERIAL IN
    PROCEEDING FOR CUSTODY OF CHILD.  In minor mother's proceeding for care and custody of illegitimate child against strangers
    to whom the doctor delivered it at birth, both plaintiff and
    her parents being morally and financially fit for such care,
    etc., plaintiff's unmarried state was immaterial, though ordinarily having a bearing on moral fitness.

6.  BASTARDS—ORDINARY MEANING OF MOTHER'S "ABANDONMENT OF
    CHILD," STATED.  Mother's "abandonment of child," as applied
    to her proceeding to regain custody, ordinarily means placing
    it on some doorstep, or leaving it in some convenient place in
    the hope that some one will find and take charge of it, or
    abandonment entirely to chance of fate.

7.  BASTARDS—UNMARRIED MINOR'S CONSENT FOR GIVING AWAY ILLE-
    GITIMATE CHILD AT BIRTH HELD NOT ABANDONMENT.  Consent of
    17 year old unmarried mother to arrangement for giving child

See 1 C. J. § 7 (1926 Anno.); 4 C. J. § 2639; 7 C. J. § 28 (1926 Anno.); 29 Cyc. pp. 1587, 1588, 1603.

[1] *Jones* v. *Moore*, 61 Utah, 383, 213 Pac. 191.

[2] *Hummel* v. *Parrish*, 43 Utah, 373, 134 Pac. 898; *Sanford* v. *Gray*, 42 Utah, 228, 129 Pac. 423, Ann. Cas. 1916A, 989; *Harrison* v. *Harker*, 44 Utah, 541, 142 Pac. 716; *Farmer* v. *Christensen*, 55 Utah, 1, 183 Pac. 328; *Kurtz* v. *Christensen*, 61 Utah, 1, 209 Pac. 340; *Jones* v. *Moore*, 61 Utah, 383, 213 Pac. 191.

[3] *Hummel* v. *Parrish*, 43 Utah, 373, 134 Pac. 898; *Sanford* v. *Gray*, 42 Utah, 228, 129 Pac. 423, Ann. Cas. 1916A, 989; *Harrison* v. *Harker*, 44 Utah, 541, 142 Pac. 716; *Farmer* v. *Christensen*, 55 Utah, 1, 183 Pac. 328; *Kurtz* v. *Christensen*, 61 Utah, 1, 209 Pac. 340; *Jones* v. *Moore*, 61 Utah, 383, 213 Pac. 191.

to third parties at birth, to avoid disgrace and because of importunings of girl's mother, *held* not such abandonment of the child as to preclude her reclaiming it.

8. BASTARDS—MINOR MOTHER HELD ENTITLED TO DISAFFIRM GIFT AT BIRTH OF ILLEGITIMATE CHILD. In view of the fact that a parent may not give away an offspring in the sense that he may his property, *held*, that a 17 year old mother, giving away an illegitimate child at birth, could disaffirm the gift and reclaim the child on arriving at majority, just as any other contract during infancy, on surrender of the consideration.

9. BASTARDS—CHILDLESS COUPLE TAKING ILLEGITIMATE CHILD AT BIRTH HELD NOT TO ACQUIRE EQUITIES AGAINST MINOR MOTHER SEEKING TO RECLAIM IT. A childless married couple, obtaining an illegitimate child at birth by arrangements with a doctor, without knowing the 17 year old mother, and without any special promise from her or her mother, who had negotiated with the doctor for such disposal, *held* not to acquire any equities against the mother in subsequent suit to reclaim the child.

Appeal from District Court, First District, Cache County; *T. H. Burton*, Judge.

Proceeding by Elva Jensen against William C. Earley and another, to reclaim a child. Judgment for defendants, and plaintiff appeals.

REVERSED AND RENDERED.

*L. E. Nelson*, of Logan, for appellant.

*J. C. Walters*, of Logan, for respondents.

FRICK, J.

Elva Jensen, hereafter designated plaintiff, on the 8th day of December, 1923, filed a petition in the District Court of Cache county, Utah, in which she, in substance, alleged that she is the mother of an infant child which, without her consent, is unlawfully and wrongfully detained by the defendants. The facts respecting the alleged unlawful deten-

tion and custody are fully stated in the petition and in view that we shall state the facts hereinafter it is not necessary that we refer to the pleadings except to state that the defendants denied the unlawful detention and custody of the child and averred that they are the lawful custodians thereof, stating their version of the facts in that regard.

We remark that we have changed the title of the case to conform to our statute and to the uniform practice in such cases in this court. In view of our statute this case should be entitled by designating the person bringing the proceeding as plaintiff and the persons against whom the petition is filed should be called defendants.

The evidence adduced on behalf of the plaintiff in support of her petition, in substance, shows that on the 14th day of April, 1923, the plaintiff, who was unmarried, and then about 17 years and 8 months of age, gave birth to the child in question here. The plaintiff lived at home with her parents, who resided at Hyrum, Cache county, Utah, and who are people of middle age, both being under the age of forty years. The father of plaintiff is a farmer and stock raiser, and owns a farm near the town of Hyrum and a comfortable dwelling house in said town. Some time in December, 1922, and a considerable time before the child was born, plaintiff's mother called on Dr. Eliason, who then lived at Logan, Utah, about seven miles from Hyrum, but who some time theretofore had lived and practiced his profession at Hyrum, and was the family physician of the Jensens. The mother says she went to the doctor for the purpose of engaging him to attend to plaintiff in her approaching confinement, which, however, was not expected to occur for some time. The mother, with considerable detail, informed the doctor of plaintiff's condition and of the impending disgrace and trouble, and how discouraged she was, and how badly she felt about the coming event. The mother had gone to the doctor without consulting or informing the plaintiff, and she testified that the doctor at that time suggested that he thought he could find "a good home for the child if you wish to dispose of it."

The mother called on the doctor again in the February following before the child was born, and she and the doctor went over the impending scandal incident to plaintiff's confinement, again, and according to her statement, the doctor then told her, "I have found a good home, Mrs. Jensen, if you want to dispose of the baby." At that time the doctor also gave some directions respecting the care that plaintiff should receive, so that she would be physically prepared for the coming event. When plaintiff was about to be confined, and after she had felt some labor pains, the plaintiff's mother notified the doctor and he and a nurse arrived at plaintiff's home about 3 o'clock in the afternoon of the 14th of April, and at about 3:30 the plaintiff was delivered of a child, and about 4 o'clock the doctor and nurse left plaintiff's home taking the newborn babe with them, and immediately delivered the same to the defendants, who then lived somewhere near Logan.

Both the mother and the plaintiff testified that at the time the child was born nothing was said about the child being taken away, and the grandmother, who was present at the time the child was born, also testified that she heard nothing said about the matter. The doctor, however, testified that after the child had been born, and when it was in charge of the nurse, he went into the room where plaintiff was in bed, and asked her, "What do you want me to do with the child?" and she said, "I want you to take it to the home you have found for it; I don't want to see it." The plaintiff, however, testified that she made no statement to the doctor at any time, and that she remembers nothing of what occurred immediately after the child was born. Plaintiff's mother also testified that she heard no such statement, and no one present at the home heard it. The nurse, who was a witness on behalf of defendants, and was present at the time the child was born, was also silent respecting the statement. In fairness to the doctor it should be said, however, that there was no one in the room where the plaintiff was lying in bed except the doctor and the plaintiff at the time the doctor says the statement was made.

The doctor also denied that he suggested to plaintiff's mother the disposal of the child. He insisted that the mother suggested that some good home be found for the child when it should arrive.

The evidence further shows that plaintiff's mother never consulted the plaintiff about the matter, except that at one time the mother some time before the child was born, informed the plaintiff that the doctor had suggested that a good home with some good people might be found for the baby, and that plaintiff at the time said that perhaps that would be the best, but that the matter was not mentioned after that time.

It is also made to appear without any substantial dispute that within a short time after the child was born and taken away, as before stated, the plaintiff began to worry and grieve about the baby, and discussed the matter with her mother; that within 33 or 34 days after the child was taken from the plaintiff the mother went to the doctor and informed him that plaintiff was grieving and worrying over the child, and told the doctor that the plaintiff wanted the child back, and asked in whose custody it was; that the doctor told the mother that the child was in a good home, and that plaintiff should cease her grieving and worrying, and should forget the incident. Shortly after that the mother of plaintiff went to the doctor again, and informed him of plaintiff's grieving, and about the same conversation as at the former meeting occurred between her and the doctor. The mother, however, demanded to know who the people were that had the child, and where they lived. The doctor told the mother that their name was Earley, but she did not learn from the doctor where they lived. After that plaintiff's father consulted a lawyer and on or about the 1st day of October plaintiff and her father and mother learned where the defendants lived, and, with the lawyer, called on them and demanded the child, and then offered to pay them any reasonable sum for the trouble and expenses they had incurred in the meantime. The defendants refused to surrender the child, and this action followed.

The evidence is also to the effect that plaintiff's father has property worth about $20,000, and that he has a comfortable home; that both he and plaintiff's mother are desirous of having plaintiff obtain the child, and in case anything should happen, to the plaintiff the father and mother are both able and willing to adopt the child as an equal heir with their other four children. Nor, according to the testimony of neighbors, is there any question concerning the plaintiff's and her parents' moral fitness to rear the child.

Upon the other hand, the evidence shows that the defendants are perhaps several years older than plaintiff's father and mother; that they have no children of their own, and have never had any, but have adopted a little girl who is living with them; that they always were very desirous of obtaining a boy also, and, to accomplish this purpose had spoken to the doctor before the child in question was born; that defendants have no home in Utah, but own some land in Canada, the value of which is not shown, except, perhaps, that at present it has no great value, and that the moral fitness of the defendants to rear the child is not questioned.

From a careful reading of the testimony of plaintiff's mother, as the same appears in the bill of exceptions, we are convinced that she was much concerned with plaintiff's condition, and that she was greatly perturbed in mind respecting the fact that plaintiff was about to give birth to an illegitimate child, and, to avoid so far as possible what to her seemed a scandal, she, without consulting plaintiff, came to the conclusion that it was best to place the infant with some good family. It is also equally clear from the doctor's testimony that, in view that he had interested himself in the matter, and had found the defendants, who were willing to take and did take the infant, it was his duty to do all within his power to have the child remain in the custody of the defendants. We do not make the foregoing observations in a spirit of criticism of the plaintiff's mother, or of the doctor, but do so merely to show that the plaintiff should not be required to bear the results of the manifest

interests of these two witnesses, but should be judged in the
light 'of the whole evidence. It must also be kept in mind,
as pointed out by this court in *Jones* v. *Moore,* 61 Utah, 383,
213 Pac. 191, that the rights involved in cases like the one
at bar are highly equitable, and that therefore the parties
within the limits stated in that case, are entitled to our
judgment in respect to what the ultimate judgment should
be. It should also be stated that in view of the state of
the evidence in this case, the question of the best interests
of the infant does not arise as a question of fact, but rather
as a question of law. Here, both parties are morally and
physically fit to have the care and custody of the infant. In
such circumstances, as is well stated in *Hummel* v. *Parrish,*
43 Utah, 382, 134 Pac. 901:

"The legal presumption is that it is for the best interests of
the child and of society for the child to remain with its natural
parents during the period of its minority and be maintained, cared
for, and educated by them and under their supervision and direc-
tion."

It is then pointed out, however, that the right is not ab-
solute, but under peculiar circumstances the right must yield
when it is manifestly for the best interests of the child that
it should yield. This court has frequently considered the
different questions arising in cases of this kind. The
following are all well-considered cases where the ques-       **2-4**
tions are fully discussed: *Stanford* v. *Gray,* 42 Utah,
228, 129 Pac. 423, Ann. Cas. 1916A, 989; *Hummel* v. *Par-
rish,* 43 Utah, 373, 134 Pac. 898; *Harrison* v. *Harker,* 44
Utah, 541, 142 Pac. 716; *Farmer* v. *Christensen,* 55 Utah,
1, 183 Pac. 328; *Kurtz* v. *Christensen,* 61 Utah, 1, 209 Pac.
340; *Jones* v. *Moore,* 61 Utah, 383, 213 Pac. 191. In all
of those cases the rule regarding the rights of the natural
parents of the child and when such rights must yield to the
paramount interests of the child is clearly stated. In view
of that, it would be a needless repetition to attempt to re-
state it here.

Nor, in view that the testimony is conclusive that the
plaintiff is, morally, a fit person to have the care and cus-

tody of her child and that her parents are likewise fit, and are financially able and willing to take care of it, is the mere fact that the plaintiff is unmarried of great importance in this case. All the authorities are to the effect that her legal rights are not impaired by that fact. Her unmarried state may, however, have a bearing upon the question of the best interests of the child, and of her moral fitness. As indicated, however, that question is not involved in this case.

We therefore approach the questions for solution in this case in the light of the facts as hereinbefore stated, and in view of the law as it is outlined above. Before proceeding to a discussion of the questions involved, it perhaps may not be out of place to state the mental attitude of the trial court, as he announced it during the proceedings. In answering one of counsel's questions the court said:

"I will tell you the attitude of the court. The court is concerned with whether there was a gift or an abandonment."

It is true that in arriving at the final conclusion the court also considered the question of the child's best interests. That question, for the reasons hereinbefore stated, is not in this case. Notwithstanding what has just been stated the district court based its conclusion very largely upon the fact that there was both a gift and an abandonment, of the child.

It is not easy to understand how the court could arrive at the conclusion that the plaintiff intended to and did abandon the child as that term is understood and applied in cases of this character. Abandonment, in such cases, ordinarily means that the parent has placed the child on some doorstep or left it in some convenient place in the hope that some one will find it and take charge of it, or has abandoned it entirely to chance or to fate. To make arrangements before hand with some proper and competent person to have the care and custody of the child is not an abandonment of it as that term is ordinarily understood. True, the mere act of giving away the child by the parent into the care and custody of another may militate against him in reclaiming its custody. If it be conceded, however, that in a limited sense the surrender of the child,

Appeal from First District

under the circumstances of this case, constituted abandonment, yet it clearly is not such an abandonment that prevents plaintiff from reclaiming her own child. Here we have a case where a child is about to be born to one who is not married. The child is therefore an illegitimate offspring, and, in the eyes of society at least, the mother, if not the child, is always a subject of severe censure, if not an outcast. The prospective, mother, therefore, feels very keenly the impending disgrace. So do the parents of the one who is about to become a mother. It is more easy to understand the mental condition of such a girl than it is to describe or define it. Not only is her actual condition of shame a nightmare to her, but she is being importuned by an overanxious mother to make some provision for the expected child before its birth to the end that all unnecessary publicity and scandal about the matter may be avoided. In such circumstances the mere fact that the plaintiff consented to what the mother proposed does not necessarily evince a desire upon the part of plaintiff to abandon her child. In addition to all of the foregoing facts and circumstances, plaintiff's age, she then being only about 17 years old, must be considered. In all of the former decisions of this court in similar cases, the young women who were in somewhat similar predicaments, and more particularly in the *Harrison* and *Krutz Cases,* were considerably older than the plaintiff. In the *Harrison Case* the young woman was about 23 years of age and yet it was held, under somewhat similar conditions, that she had not irrevocably abandoned her child by making arrangements to have some one take it at its birth. The reason why this court arrived at a different conclusion in the *Kurtz Case* was because the circumstances were different, and in that case the question of the best interests of the child constituted a large, if not controlling factor. We are therefore clearly of the opinion that under the peculiar facts and circumstances of this case the plaintiff cannot be held to have abandoned her child so as to deprive her of the right to reclaim it in a proceeding of this kind.

Nor is the contention of gift any more convincing than the claim of abandonment. Both contentions, to some extent, involve the same legal principles, where, as here, the subject of the alleged gift is an infant child. If the plaintiff in this case had purchased an expensive fur coat, or any other article which was not deemed an article necessary to her condition and standing in life, she could at any time within a reasonable time after arriving at the age of maturity have disaffirmed the contract of purchase and returned the coat or other article to the seller. Again, if she had sold any article of value, however great or small, and at any time within a reasonable time after having attained her majority she had tendered back the consideration received therefor and had demanded back her property, she would have been entitled to it as a matter of law. If, therefore, she as a matter of right could have disaffirmed her acts and contracts relating to property, why may she not do so with respect to her child, which is a matter of infinitely greater importance to her than mere property rights would be? Is the law more liberal, more humane, with minors in dealing with their contracts affecting property and property rights than it is when it affects their offspring?

In view of the fact that a parent may not make a gift of his offspring in the sense that he may give away his property, it would seem that, in circumstances like those in this case, where the mother of a child has made an alleged gift of such child when she was under the age of majority, she should at least be given the same right of disaffirmance as she would have if she had made a sale of property merely.

Nor is there any question of estoppel involved here. Nor are there any equities which appeal to the conscience of the court in favor of defendants. The defendants took the child at its birth and cared for it, but they did so not as a mere act of charity, but because they wanted a male child. What their purpose was in obtaining it is of no particular consequence. Neither did they take the child as a special favor to or out of regard for the plaintiff since they did not

know her.  Nor did they receive any special promises from either the plaintiff or her parents.  While no doubt defendants' act in taking and caring for the child was most commendable, yet no equities could arise in their favor by reason of that fact for the reasons just stated.  When the custody of the child was demanded they refused to surrender it, and they did so for no other reason than that they wanted to keep the child.  They would have refused to surrender the child at any time before its custody was demanded, and in view of that no special claim arises in their favor.

In addition to all that has been said it has also been held that a gift or an abandonment may not lightly be inferred from either acts or language induced by grief, discouragement, or mental distress.  *Norval* v. *Zinsmaster*, 57 Neb. 158, 77 N. W. 373, 73 Am. St. Rep. 500, where the Supreme Court of Nebraska points out that in such circumstances statements and promises may not be taken at their full value.

In view, therefore, of all the circumstances of this case, and in view of what has been said over and over again in the cases to which reference has been made, we are forced to the conclusion that this case contains nothing which would justify the conclusion that the plaintiff had either abandoned or given away her child to the defendant.  Nor is there any fact or circumstance upon which the court could base a justification for denying to the plaintiff the right to the custody and control of her child.

It follows, therefore, that the findings of fact and conclusions of law of the district court are annulled and set aside, and the judgment reversed, and it is ordered that judgment be entered in this court awarding to the plaintiff the care, custody, and control of her child, and that the defendants be required to surrender the same to the plaintiff, or to any one in her behalf, upon receipt of a copy of this opinion.  Neither party to recover costs.

GIDEON, THURMAN, and CHERRY, JJ., concur.

WEBER, C. J., did not participate herein.