In re BRADLEY.
BRADLEY et al v. MILLER et ux.

No. 6890. Decided April 15, 1946. (167 P. 2d 978.)

540

See 43 C. J. S., Infants, sec. 97; 39 Am. Jur., 753.

*O. K. Clay,* of Salt Lake City, for appellant.

*J. Rulon Morgan,* of Provo, for respondent.

WADE, Justice.

This appeal is taken by Barbara Bradley, the mother of Ronald Duane Bradley, an illegitimate child born October 9, 1943, from a judgment of the Juvenile Court for Utah County, denying her petition that Ronald be taken from the custody of respondents, Robert D. Miller and Mattie Miller his wife, where the court had previously placed him, and that he be returned to her custody. Although much of the argument centers around the questions of whether she had abandoned the child and whether she is a fit person to have his custody, the determining question here presented is: Did the court err in holding that from the circumstances of this case the welfare of the child requires that his custody be taken from the mother and given to the Millers?

Most of the surrounding facts and circumstances are not in dispute, the main dispute is, what conclusions should be drawn therefrom? The following facts are undisputed and were found by the court: That Mrs. Miller is the sister of Barbara's mother, Mrs. Vera Hickok, and is Barbara's aunt; that the Millers have lived for many years in the town of Salem, Utah, where they have a moderate home and income; Barbara's mother has made her home in Salt Lake City; that Barbara's father was named Ellis, her mother is divorced from him and married to and lives with Mr. Hickok; that at various times Barbara has lived with the Millers for short periods; that during the summer of 1942, Barbara ran away from her mother's home and went to California with a soldier with whom she was not married; later her

mother went to California and brought her back home, and thereafter from the late summer until about November 20, 1942, Barbara lived with the Millers in Salem, some of which time she attended high school, but she failed to attend regularly and was out of their control so they asked her mother to come and get her; that while she lived with the Millers in 1942 she had a venereal disease; that neither this soldier nor her present husband is the father of Ronald, but his father is named Smith; that after she became pregnant she again ran away from home in the summer of 1943, and was working as a waitress in a cafe in Sparks, Nevada, where she met Bradley, and they commenced living together as husband and wife without being married. Later they moved to Salt Lake City where they continued to so live, and while so living there Ronald was born on October 9, 1943. Thereafter, on November 12, 1943, under arrangements made by the Family Service Society, they were married, and later they moved into a home by themselves in Salt Lake City where they lived until April of 1944, when they moved to Salem, Utah, and lived in a home near the Millers where Bradley obtained work on various farms in that neighborhood until July.

Mr. Bradley has been convicted a number of times of felonies and served time therefore, and is at present on parole from the Nevada State Prison. When they moved to Salem, Bradley failed to notify his draft board of his change of address and on that acount was arrested by the F. B. I. on July 17, 1944, and taken to Salt Lake City where he was held in the county jail for some time. When Barbara learned of this she took her baby who was about nine months old to Mrs. Miller and asked her to take care of him while she went to town, but instead without disclosing her intentions to do so, she proceeded to Salt Lake City where she tried, at first unsuccessfully, to locate her husband. She however left in her home a letter apparently addressed to the Millers which they found the next day after she did not return that night in which she wrote:

"Folks
   "Here's Ronny take care of him. I'm off somewhere and may be back.
   "God loves Ronny & so do I. I hate to do this but I have to for a week love.

                                      "B"

    Shortly thereafter the Millers brought this situation to the attention of the juvenile court and its probation officer made an investigation and on August 2nd signed and filed a petition wherein it was alleged that Ronald was a dependent and neglected child and asked the court to determine his future custody. This matter was set for hearing on August 16, 1944, and notice to that effect was issued to the parents and guardian, and a waiver of such notice was signed by the Millers. Neither Stephen Bradley nor Barbara prior to the hearing had any notice or knowledge that this hearing was to take place or that such a proceeding had been instituted but after the hearing, the notice and waiver thereof, which had been signed by the Millers, was presented to them and they wrote their names on lines below the signatures of the Millers, and their names were typewritten in the body of the waiver above the names of the Millers; the waiver is not dated but it would seem to give the impression that they had waived the hearing prior to the time when the hearing was held. Such impression is false and it seems almost unbelievable that a judge would knowingly allow such a false record to remain on the files of his court. However, the decision which we are called upon to review, is not in any manner based on that waiver because after she knew of all the facts, Barbara filed a petition asking that the original orders be set aside and the child returned to her custody. The entire matter was heard on the hearing on this petition.

    When Barbara failed to locate her husband in Salt Lake City, she did not return to her baby or the Millers but obtained work in that city and lived with a girl friend, and sent the Millers a letter which was post dated August 7, 1944, which reads:

"Folks:

"I hope Ronny is well. I want you to have him. Because I'm going over there some time soon, I mean to Hawaii. If I like it I'll probably stay there. I'm sending Ronny's ration books home along with Steve's. Tell Steve I'm sorry but this is the way it has to be.

"I'm not sending my ration book to you because I have to give it to the Government. You see the Government is paying for everything. Love.

"B" ·

On August 16, the juvenile court held the hearing on the custody of this child and found it to be dependent and neglected and placed it in the custody of the Millers. Barbara did not obtain the employment with the government which she wrote about in her letter of August 7th and did not go to Hawaii. Shortly after writing that letter Stephen was released from the county jail and contacted her and they lived together in Salt Lake City from then on. About August 19th, Stephen went back to Salem to collect some money which was owing to him, and visited the Millers and discussed with them the baby and the proceedings in the juvenile court. Thereafter he and Barbara went to Provo where they contacted Judge Terry of the Juvenile Court and discussed with him the custody of the baby. When they left they were under the impression that there was a hearing on this matter in the juvenile court set for November 17th, and on that day they returned for such hearing but learned that no hearing was set for that time. From there they proceeded to Salem where Barbara demanded that the Millers surrender the baby to her, which they refused. Prior to that visit Barbara sent the baby some small items of clothing. This visit was the only time she saw the baby after she left it on July 17th, up to the time of the trial.

On December 11, 1944, Barbara filed a petition in the juvenile court wherein she asked the court to set aside its order placing the custody of her child with the Millers and restore it to her; the Millers filed an answer to this petition and a hearing thereon was held on January 19, 1945, and from that date continued to February 1st, and thereafter on

July 6, 1945, the court made and entered its findings of fact, conclusions of law and judgment, wherein the court found the facts in great detail in favor of the Millers and ordered that the Bradleys be deprived of the custody of the child and that it be placed in the custody of the Millers.

The Millers also claim that when the child was left with them it was not clean, and that its body was sore and irritated by being left in an unclean condition and that it was sickly and needed a doctor's care which they provided for it; that Barbara was not clean in her housekeeping and instead of taking care of her household duties she would lay around and play cards and smoke cigarettes and go out to beer parlors, that when Barbara lived with them in 1942 her mother sent her to them because she had become uncontrollable and felt that it would be better for Barbara to go to a small town rather than remain in a large city, and that while with them she sluffed school and went to beer parlors and out with boys when she should have been attending school and on that account they requested her mother to take her away; that while Barbara lived in Salt Lake City, after the baby's birth, and before she moved to Salem, she was a very bad housekeeper and failed to give the baby proper care; that she would leave the baby alone for long periods of time and would not settle down and take the responsibility of its care, and that it was on this account that she moved to Salem where it was felt that the temptation to neglect the baby in this manner would not be so great. All these claims were denied by Barbara, but the court found against her on these facts and we find that the courts findings in this respect are supported by the great preponderance of the evidence.

At the time of the trial Barbara was living with her husband in Salt Lake City in a residential hotel where she took care of the office and received therefor the rental of the two rooms in which they lived. It is conceded that this is not a desirable place to rear a child, and there was some talk of her getting another place if the child was awarded to her. Barbara at the time of the trial was twenty years old, and

her husband was thirty-eight. He worked for a transfer
company and earned $175 per month. Both of the Millers
were forty-eight years old.

Section 14-7-5, U. C. A. 1943 of the Chapter on Juvenile
Courts makes the following definitions:

"The words 'neglected child' include:

"A child who is abandoned by his parent, guardian or custodian.

"A child who lacks proper parental care by reason of the fault or
habits of the parent, guardian or custodian.

"A child whose parent, guardian or custodian neglects or refuses to
provide proper or necessary subsistence, eduction, medical or surgical
care or other care necessary for his health, morals or well-being.

\* \* \* \* \* \*

"The words 'dependent child' include:

\* \* \* \* \* \*

"A child whose custody is in question or dispute."

## Section 14-7-29, U. C. A. 1943, provides:

"At the conclusion of any hearing the court may dismiss the case,
or many render a decree and judgment that the child is delinquent, de-
pendent, neglected or otherwise within the provisions of this chapter.
If the juvenile is adjudged delinquent, dependent, neglected or other-
wise within the provisions of this chapter, the court shall enter in
writing the facts constituting such delinquency, dependency, neglect
or other offense and may further adjudge and decree as follows:

\* \* \* \* \* \*

"(4) That the child be placed under such guardianship or custody as
may be warranted by the evidence and for the best interest of the
child; provided, however, that in the selection of a guardian the court
shall give due consideration to the preference of parents."

## Section 14-7-31 provides:

"No child \* \* \* shall be taken from the custody of its parents
\* \* \* without the consent of such parents \* \* \* unless the
court shall find from the evidence introduced in the case that such
parent \* \* \* has knowingly failed and neglected to provide for
such child the proper maintenance, care, training and education con-
templated and required by both law and morals, \* \* \* or unless
the court shall find from all the circumstances in the case that public

welfare or the welfare of a child requires that his custody be taken from its parents * * *."

Section 14-7-5, as far as it has a bearing on this case, defines a neglected child as one who is abandoned by its parent, or one who lacks proper care by reason of the fault or habits of the parent, or one whose parent neglects to provide proper or necessary subsistence for its health or well-being, and defines a dependent child as one whose custody is in question or dispute. Section 14-7-29, authorizes the court, where supported by the facts, to render a decree and judgment that the child is dependent and neglected and to make findings of the fact constituting such dependency and neglect, and in such cases to place the child under such custody as is warranted by the evidence and *for the best interest of the child* but requires that the court shall give due consideration to the preference of the parent. Section 14-7-31 requires that no child shall be taken from its parent without the parent's consent unless the court shall find one or more of the therein specified sets of facts. The sets of facts specified which have a bearing on this case are: that the court shall find from the evidence that the parent has knowingly failed and neglected to provide such child with the proper maintenance and care contemplated and required by both law and morals or the court shall find from all the circumstances in the case that the welfare of the child requires that its custody be taken from the parent.

If the term "abandoned" as used in section 14-7-5, is used in the sense that it is defined in *Jensen* v. *Early,* 63 Utah 604, 228 P. 217, and *Harrison* v. *Harker,* 44 Utah 541, 142 P. 716, then Barbara did not abandon her baby. However, it may well be that the legislature in enacting this section intended that term to have a much broader meaning than that placed upon it in those cases so that it would cover the situation here presented. We are not here called upon to determine that question because when Barbara left this child with the Millers as she did, without providing for its care or support, she clearly neg-

lected to provide it with the proper or necessary subsistence for its health, morals and well-being and it thereby became a neglected child as defined by section 14-7-5, as set out above. The baby when she left it with the Millers was also a dependent child as defined in section 14-7-5, because the only arrangements she made with the Millers was to leave it with them while she went to town. Later they received from her two letters which authorized them to keep the child, but they did not agree to take care of the child for her and they were well within their rights to bring the matter to the attention of the Juvenile Court and to place upon it the responsibility of determining in whose custody it should be placed. Thereby the custody of this child was brought in question. Thus the court was correct in finding that the child was dependent and neglected.

When the court found under the facts in this case that the child was dependent and neglected it was required under section 14-7-29 to place it under such custody as is for its best interest giving due consideration to the preference of the parent. Barbara having expressed in writing that she wished the Millers to have her child, and the court being of the opinion that it was for its best interest, the court properly placed the child in the custody of the Millers. At this stage this child became a ward of the Juvenile Court. It is true that at the first hearing Barbara had no knowledge or notice of the hearing and the court did not have any jurisdiction to determine her right to its custody but she did leave it with others under such circumstances that it became a dependent and neglected child, and the court thereby obtained jurisdiction to determine who should temporarily have its custody.

When Barbara returned and filed her petition asking the court to restore the child into her custody she submitted to the jurisdiction of the court, the court then had before it a child who because of her actions in regard to it had become dependent and neglected and a ward of the court and the court under section 14-7-31 was required to determine as between the natural parent and an-

other person in whose custody the child should be placed. That section as applied to the facts in this case requires that no child shall be taken from its parent, without the parent's consent, unless the court shall find from the evidence, either that the parent has knowingly failed to provide the child with the proper maintenance and care contemplated and required by both law and morals, or unless the court shall find from all the circumstances in the case that the welfare of the child requires that its custody be taken from the parent. It is clear that Barbara in leaving the child as she did knowingly failed and neglected to provide her baby with the proper maintenance and care contemplated and required by both law and morals. But this alone does not require the court to deprive her of its custody. This section merely forbids the court to deprive the parent of the custody of its child unless the necessary finding is made but does not require the court to deprive the parent of the custody in all cases where such finding is made. Under section 14-7-29, in all cases the court is required to place the child under such custody as shall be for its best interest. The court might well conclude that it would be for the best interest of the child to place it in the custody of the natural parent even though at some time such parent had failed to provide it with the necessary maintenance and care. Thus our problem is to determine what is for the best interest of this child, or whether the welfare of this child requires that its custody be taken from Barbara, its natural parent.

Before determining this question we call attention to the fact that cases involving the custody of a child are cases in equity and this court is required to determine the facts as well as the law. *Harrison* v. *Harker,* supra; *Jones* v. *Moore,* 61 Utah 383, 213 P. 191; *Jensen* v. *Earley,* supra; *Wallick* v. *Vance,* 76 Utah 209, 289 P. 103. We must therefore examine the record and independently determine the facts therefrom, keeping in mind that the trial judge who heard and saw the witnesses was in a better position than we are to weigh and evaluate their evidence. *Stanley* v. *Stanley,* 97 Utah 520, 94 P. 2d 465.

The trial court court ruled that the burden of proof was on the Millers to prove that Barbara was unfit to have the custody of her child but was on Barbara to prove that she had not abandoned it. This ruling was not material in this case because all disputed questions of fact that were material in the determination of this case were supported by a substantial preponderance of the evidence in favor of the Millers. But under section 14-7-31, the court is prohibited from depriving a parent of the custody of its child unless it finds from the evidence the necessary facts required to be found for that purpose. This seems to indicate that on any fact necessary to support a decision to deprive the parent of its child the court must first be convinced of such fact by a preponderance of the evidence on such question and thus the burden of persuading the court on such facts is never on the parent. There is a presumption that it will be for the best interest of the child to be reared by its natural parent, and that presumption is not overcome until the trier of the facts is satisfied from the evidence to the contrary. Such presumption being based on logic and natural inference should be kept in mind by the trier of the facts and weighed and considered along with the other evidence in determining what is for the best interest of the child. We are satisfied that such rule applies equally to a proceeding in the Juvenile court under the statute as it does to a proceeding in the District Court.

From the facts and circumstances of this case we are satisfied that the court correctly held that the welfare of this child requires that Barbara be deprived of its custody and that it be placed in the custody of the Millers. The Millers are people of sound morals, clean in their habits and home, they are devoted to this child and will give it the personal care and attention and the necessary medical aid which its delicate health at present requires; they have a satisfactory home and the financial ability to support the child. On the other hand while Barbara and her husband are financially able to support it their home surroundings, moral background, personal habits, and medical and personal attention

to the child do not meet the requiremens of the health, moral and physical well-being of a child. Barbara has been somewhat wayward prior to the birth of this child, she ran away from home twice shortly before this baby came, and during each of these times she lived with a man as husband and wife without being married; between these events she became pregnant from another man who was not her husband, she became afflicted with a venereal disease, and her marriage to her present husband was only solemnized after she had lived with him for some time as man and wife, and after arrangements therefor had been made by the Family Service Society. Her husband has had several felony convictions and is now on parole from the Nevada State Prison, the fact that he lived with Barbara without being married to her, and that he failed to notify the draft board of his change of address, to some extent indicates an antisocial attitude. Since the baby came Barbara has not settled down and given it the personal care it requires, while she lived in Salt Lake City she would leave it unattended, and failed to keep the baby or her home clean. After she moved to Salem she still failed to keep her home or the baby clean, so that its body became sore and irritated, and she failed to give it the medical care that its condition of health required and finally when her husband was arrested on July 17th, she left without making arrangements for its care, and although her husband went back to Salem in the meantime, she did not see it until November 17th. All of these things show that she is immature and unstable and is not at present ready to take the responsibility of properly caring for this child.

It is argued that although Barbara had illicit relations with men prior to her marriage, there is no evidence that she has committed any such crime since, and although her husband has a criminal record, he is now on parole and Barbara cannot be deprived of her child on account of being married to him now. This argument is directed to the contention that the court erred in finding that Barbara was not a fit person to have the custody of

her child. If that finding were the sole basis of the decision, and the finding was based solely on the past records of these people there would be much force to the argument. But the basis of our decision is not that finding, but the finding that the welfare of the child requires that Barbara be deprived of its custody, at least for the time being. In determining what is for the best interests of the child we must take into consideration all of the surrounding facts and circumstances, and the fact of Barbara's previous indiscretions and her husband's previous criminal record are facts which have a bearing on that question.

This does not mean that Barbara will be forever barred from obtaining the custody of her baby, the child remains a ward of the juvenile court, and the custody of the child may be changed when justified by the surrounding facts and circumstances.

The decision of the trial court is affirmed.

LARSON, C. J., and McDONOUGH, J., concur.

WOLFE, Justice (concurring).

I concur. Even if Sec. 14-7-5, U. C. A. 1943 used the word "abandoned" in the sense of "forsaken," conduct less than that can show such indifference, supineness or irresponsibility as to show neglect within one of the other definitions of the term "neglect" as used in Sec. 14-7-5. Simply leaving a child with others with instructions to care for it even with well grounded reasons for thinking that such person will, out of love or plain humanity, not fail adequately to care for it, may not be abandonment but gives content to the finding that the parent has neglected to provide proper and necessary subsistence, education, medical or other care for the health, morals or well-being of the child. Where a parent makes arrangements for someone else adequately to care for the child by some proper and responsible person, such parent may be, through others, caring for the child. But leaving it with another in the hope that such other will care for it, which leaving is attended with such circumstances as to

show irresponsibility and dependence on the chance that the party with whom the child is left will care for it, reveals a species of neglect. I therefore think the finding of the juvenile court sustained by the preponderating evidence. I further agree that under the circumstances of this case we should conclude that the welfare of the child required that it remain with the Millers and that the judgment of the juvenile court should accordingly be upheld. I therefore concur.

PRATT, Justice, not participating.