## HARDCASTLE v. HARDCASTLE et al.

No. 7423. Decided August 30, 1950. (221 P. 2d 853)
Rehearing denied November 14, 1950.

See 67 C. J. S., Parent and Child, Sec. 12. Presumption that child should be reared by natural parents, 4 A. L. R. 2d, 1. See, also, 39 Am. Jur. 599.

*Skeen, Thurman & Worsley,* Salt Lake City, for appellant.

*Mulliner, Prince & Mulliner,* Salt Lake City, for respondents.

LATIMER, Justice.

Plaintiff filed a petition in the District Court of the Third Judicial District to modify a decree of divorce en-

tered on May 8, 1946. In the original proceedings plaintiff was granted a divorce from her former husband, the defendant in this action. There had been one minor child born as the issue of the marriage and her custody and control was awarded to Ordell Hardcastle, who is the mother of the defendant and who is the interpleaded defendant. By her present petition plaintiff seeks to have the decree modified so she can gain custody of the child. The defendant, Ordell Hardcastle, was not a party in the original divorce proceedings, but was interpleaded as a defendant in this cause because of being awarded custody by the court and because the child has lived with her since shortly after her birth. The defendant does not seek custody of the child for himself but opposes having the decree modified and custody awarded to the mother. The lower court, after a hearing on the merits, refused to modify the decree and dismissed the petition. From that decision the plaintiff appeals, contending that the lower court's ruling is contrary to law and to the facts established. For identification purposes in this opinion, the mother will be referred to as the appellant, and the grandmother as the respondent.

In view of the findings and judgment of the trial court, we shall state the facts in a way favorable to respondent.

The appellant and defendant intermarried on November 25, 1942. At that time appellant was fourteen years of age. The record discloses that they resided in Bingham for a short time immediately after the marriage, but some time in August of 1943 they moved into the home of respondent and her husband. Approximately two months later, on October 28, 1943, the child Janet was born. The following month, the defendant entered the military service and in March 1944 he was ordered overseas. For a period of six or seven months immediately following the birth of the child, appellant and the baby continued living with respondent. Appellant occasionally visited with her father and mother in Bingham, Utah, but always returned

to the home of respondent because of difficulty with her father. On December 29, 1943, appellant, after having had trouble with her parent, informed the respondent she was unable to take care of the baby. Accompanying this declaration was a suggestion that the grandmother assume the responsibility for caring for the child as the mother thereupon gave the birth certificate to the respondent.

On one of the occasions when appellant was visiting in the home of her parents, presumably on or about May 29, 1944, respondent received a call to go to Bingham to get the baby. She proceeded to the home of appellant's parents and waited until 12:30 A.M. At that time respondent left and returned to her home as appellant had left the house with the baby before respondent arrived and had not returned. At about four o'clock A.M. the next morning, respondent was awakened by the appellant arriving at her home. Appellant at this time told respondent she could have the baby and that she, appellant, would sign any papers necessary to release custody of the child. Appellant, however, continued to reside with the respondent.

Some time in the early part of July, 1944, appellant left the Hardcastle home after a dispute with one of the minor girls. She then took up residence with a family by the name of Brown, who lived in Riverton, Utah. She was there for approximately two weeks and on two occasions made attempts to get possession of her child. Not long after moving to the Brown home, appellant returned to the Hardcastle house at approximately 11:00 o'clock P.M., picked up the baby and started to leave. An argument ensued between the mother and the grandmother about the right of the latter to keep the child. The respondent prevailed and she prevented the appellant from removing the child from the home. On one other occasion, during this two-weeks period, respondent delivered an allotment check to the appellant at the Brown home. Appellant again

sought to get possession of the baby and a scuffle ensued. The respondent again prevailed and the child was returned to her home.

Shortly after the last dispute with respondent and some time in the month of July, appellant left the state of Utah and went to Portland, Oregon. During her stay in that city she obtained employment in a shipyard and earned as much as $85 per week. This was in addition to $80 per month she received from the defendant in the form of a government allotment. She remained in the city of Portland until late December, 1944, when she left for Southern California. In spite of her earnings and the money she received from the government, appellant during the time she was in Portland, sent only the sum of $20 as a contribution for the child's support and maintenance.

During the latter part of 1944 some type of action was commenced in the Juvenile Court of the Second Juvenile District but the record is entirely unsatisfactory as to the reasons for or the nature of the proceedings. They are incidently involved in a determination of the custody of the child as that court found the baby subject to its jurisdiction and ordered her placed with respondent. It rather dimly appears from the record that a dispute arose between appellant and her husband over distributing the proceeds of an allotment made by defendant. The total amount allotted was $80 per month. Appellant was keeping the full amount for herself and not remitting to the grandmother the $30 per month included for the support of the child. Someone complained about the distribution of these funds and proceedings were started in the Juvenile Court. At that time the father was overseas, the mother was in Portland, Oregon, and so the respondent was the only one ordered to appear at the hearing. Appellant executed some documents in connection with directions received from the Juvenile Court, but the contents of the documents are not disclosed. As a result of the hearing, the Juvenile

Court found that the baby was a neglected and defendant child and awarded custody to the grandmother. Appellant claims she never received information as to the purpose of the hearing or notice of the order as made. In view of the declarations made by the Juvenile Court Judge in this hearing it appears that the order as made was not final in its nature and was principally for the purpose of straightening out the financial difficulties then being encountered. That it accomplished this result is evidenced by the fact that commencing in December, 1944, the $30 per month was paid to the respondent for the support of the child.

Near the end of the year 1944, appellant left Portland and proceeded to San Diego, California, where she lived with her family. Her father was then an officer in the Navy and her mother was employed in a war industry. Her sister, who was very ill, and a younger brother also resided in the same home. While living in San Diego appellant was employed as a car-hop at a drive-in restaurant. Her salary during this period was $24 per week. Due to the illness of the sister an arrangement was worked out whereby appellant assisted with her care during the day and the mother assumed the duties at night.

In May, 1946, appellant returned to Utah and instituted the original action for a divorce. She visited the child and respondent, but made no mention to the latter that she sought custody of the child. At this time she disclosed to respondent that one of the purposes of the divorce was to permit her to marry her present husband. Prior to her court appearance, the appellant discussed with defendant the problem as to who should have custody of the child. When it appeared that difficulties and delay might be encountered if appellant refused to yield custody of the child to the respondent, she consented, and the decree was entered adjudging custody to the grandmother.

In November, 1946, appellant married her present husband with whom she now resides at Mount Heliz, California. There is one son born as the result of this second marriage. Appellant visited Utah in 1947 and saw her daughter at that time, but made no effort to obtain custody. Her mother had returned to Bingham, Utah, and from the time of appellant's marriage until the institution of the petition to modify the decree appellant followed the life of her daughter through corresponding with her mother. During this period, she sent some gifts to the daughter, but contributed nothing to her support or maintenance. On November 19, 1948, appellant filed the present petition to modify the divorce decree so she could obtain custody of the child. The petition was founded on the allegations that appellant had remarried; that she had improved her financial situation; that she could furnish the child a good home and a desirable environment; and that it would be for the best interests of the child to be reared with her mother.

There can be no question but that appellant has improved her financial standing. Since her marriage November 9, 1946, she and her husband have acquired a new home in a very fine residential district in Southern California. The husband's income is approximately $1,500 per month and he is willing that the child live in the home and share its comforts. If their marriage is successful and if their present financial status remains substantially the same, the child has an opportunity to share the benefits obtainable by money. The physical surroundings of appellant's home lend themselves to proper development of the child as there are schools, playground, and recreational facilities in the immediate vicinity available for the use of children.

. The home of respondent is meager by comparison. She lives on a farm located near Sandy, Utah, and has been forced to raise eight children of her own on a very limited income. Respondent's family living at home has decreased

over the years, due to marriages, and there are now remaining in the home four children other than Janet. The latter occupies sleeping quarters with two of these children. Over the years of Janet's life, improvements have been made in respondent's home and further improvements are contemplated, although modern conveniences will be limited. Respondent's home is not favorably situated for development of children. It is a long way removed from recreational facilities, and, while schools are available, the youngsters in that area must commute by bus.

A strong bond of attachment has developed between Janet and respondent. She has had the care of the baby almost constantly since birth. She has guided her through the difficult years of infancy and has provided medical care and attention to nurse her through her childhood diseases. The baby has lived and associated with the other Hardcastle children and undoubtedly a brother and sister relationship has been created between Janet and the younger children of the respondent. The youngest of the Hardcastle children was eight years of age at the time of trial, so that Janet fits in the family as a younger sister.

At the time of the hearing appellant was twenty-one years of age and respondent was forty-seven. The respective ages favor the mother, but having been separated from the child over practically all of her life, there is and could be no showing made that mother and daughter are companions for each other. If a strong bond of affection is to exist it will be because of future activities of the mother and not because of any past conduct.

Both appellant and respondent are fit and proper persons to have custody of the child. On three occasions the respondent has satisfied the courts of this state that she is competent for this purpose and the evidence definitely establishes that she has reared the child well and given it the love and affection of a natural mother. While appel-

lant's conduct over the period of years has indicated an indifferent attitude toward the child, there are many extenuating circumstances which argue against any contention that she is an unfit person to have custody of her own daughter.

Appellant contends that there is a presumption that it will be for the best interests and welfare of the child to be reared under the care and control of its natural mother. In the case of *Walton* v. *Coffman,* 110 Utah 1, 169 P. 2d 97, 102, Mr. Justice WADE, speaking for the court, stated the rule in this connection to be as follows:

> "We conclude that the determining consideration in cases of this kind is: What will be for the best interest and welfare of the child? That in determining this question there is a presumption that it will be for the best interest and welfare of the child to be reared under the care, custody and control of its natural parent; that this presumption is not overcome unless from all of the evidence the trier of the facts is satisfied that the welfare of the child requires that it be awarded to someone other than its natural parent. Thus the ultimate burden of proof on this question is always in favor of the parent and against the other person."

This rule, however, is not applicable in this case. If we discard the Juvenile Court hearing because of informality and uncertainty, we still have the judgment of the Third Judicial District Court in the original action which inferentially holds it was for the best interest and welfare of the child to be left with the grandmother. That judgment cannot be attacked at this late date and the presumption which previously existed in favor of the natural mother yields to the contrary finding made by the court at that time.

Our concern, therefore, is to determine whether the facts established in the court below show that the best interests and welfare of the child will be with the grandmother or with the mother without indulging in any presumption. However, the absence of the presumption does not weaken the universal belief that there is no sub-

stitute for the love of the real mother. It should be kept in mind in this connection that the trial judge, after seeing the parties and hearing the evidence, concluded that the welfare of the child demanded that the existing status be retained. He had the benefit of seeing the litigants, observing their demeanor, and noting their hostility towards each other. Therefore, unless this conclusion is contrary to the evidence, it should be affirmed. *Jones* v. *Moore,* 61 Utah 383, 213 P. 191; *Harrison* v. *Harker,* 44 Utah 541, 142 P. 716.

Without question, there is a strong bond of affection between Janet and her grandmother. To tear the baby away will cause unhappiness and distress to the woman who for the past seven years has been the real mother to the child. Moreover, it will tear the minor away from the environment, surroundings, love and affection that she always has had and now enjoys. It is of course, impossible to ascertain the harm, if any, which may result from transplanting the baby at such an impressionable age. On the one hand, she may easily forget her former surroundings and associates if conditions in the new home are pleasant and enjoyable and if there is created a bond of friendship and love between the mother and daughter. On the other hand, the move may have a telling effect on the child if cruelty, jealousy or indifference creep in.

Presently, there can be little love and affection between the child and her natural mother. Undoubtedly, the mother-daughter affection has been undeveloped because of the prolonged separation. The child has never known any mother other than respondent and she cannot have formed any strong attachment to and love for a mother with whom she has never become acquainted. Undoubtedly, at this stage of life, and under present conditions, the child would prefer living with the grandmother.

Were it not for the necessity of trying to look into the future, the solution of this problem would not be difficult.

However, there is always present in this type of case a determination of the question: What does the future hold for the infant? We must judge the future by that which is past, and so we look back over the years to observe the absence or presence of elements which we believe throw light on the advantages or disadvantages of placing the child with either of the litigants. The grandmother at the time of the hearing was same forty-seven years of age and is rapidly reaching that point of life where she should not be burdened with the trials and tribulations occasioned by mothering a young daughter. If the demands of the child become too burdensome, the grandmother may not be able to respond. At the time when the young daughter may need the companionship, association, and advice of a mother most, the grandmother may have reached an age where it is not convenient to be a companion and associate with the child. The mother is only 15 years older than the daughter and as the latter approaches womanhood, the two are apt to develop a close and intimate relationship.

The educational possibilities of the child, if left with the grandmother, are not good. Unless funds are furnished by the mother and the stepfather, it appears that opportunities to attend schools of higher education will not be possible. Attendance at the grade schools under present circumstances is not easy. There are substantial distances between the home of respondent and the nearest schools and the child is forced to commute in order to attend the grade schools. The same conditions will apply to high schools and colleges. The location of respondent's home is such that neighbors are some distance away and opportunities for acquiring knowledge by association with other children are limited. If left with the grandmother, the circle of acquaintances for the minor as she grows into maturity will necessarily be small. Her lot will be cast as that of a farm girl who is raised under healthy but hard-

working conditions, limited scholastic opportunities and social handicaps.

On appellant's side of the ledger, we have the following credits: She can offer the child a nice environment free from menial labor, unlimited scholastic opportunities, pleasant living conditions and social privileges. There should be present an ease of living, which is coveted by many. Moreover, opportunities should be available for a large circle of acquaintances, a more rounded education, and a broadening of knowledge by travel. All those advantages which can be purchased by wealth should be available to the child. There can be no doubt that from an economic standpoint the child stands to profit by being with the mother.

The next comparison deals with the human elements which, after all, are the most important. The trial court found that there was not a strong bond of affection between the mother and daughter and that there was one between the grandmother and granddaughter. The affection, or lack of affection of the litigants for the child must be projected into the future and the probabilities determined as to which of the two will, over the coming years, give to her the most love and happiness. During the years to date, the advantage is with the grandmother. She has administered to Janet's needs, nursed her through her sicknesses, and has in all respects given to her the love of a mother. It is hard to visualize how or in what respects this love and attention would lessen in the future. From all indications the same pattern will be followed.

We view the mother's past acts and conduct in a little different light. She, undoubtedly, has been the victim of youth, inexperience, and early hardship. The child was born under trying and adverse circumstances and the mother was forced to seek shelter for her child with relatives or inlaws. She had no home of her own and was

forced to get along as best she could. She was buffeted between her father and her husband's family. The father of her child was absent and she had neither haven nor peace of mind. It is not difficult to understand why, under these circumstances, a minor, fifteen years of age, would yield possession of her baby to a grandmother.

Without resolving the question as to whether the original parting was voluntary or forced, the subsequent actions of the mother indicate a rather indifferent attitude toward the welfare of the child. While in Portland, Oregon, she was making sufficient money that contributions could have been made to the support of the baby. After leaving Portland and arriving in San Diego, appellant chose to devote most of her spare time, money and energies toward the help and support of an invalid sister rather than towards building a home and future for her child. When she came to Salt Lake City in 1946 for the purpose of obtaining a divorce, she preferred to yield the custody of the child rather than to risk the loss of her second marriage. For a period of two years after having remarried and living in comparative luxury, no serious efforts were made by her to obtain custody of the child and she was seemingly content to live her life without the presence of the baby.

The mother's actions are mentioned, not for the purpose of painting a calloused and indifferent attitude on her part, but for the purpose of showing her feelings toward the child when conditions were adverse. Before leaving Salt Lake City, the appellant made two attempts to regain possession of her child but she was overpowered by the respondent. These are the only serious efforts made by appellant over a four-year period of time. The long absence has prevented the child from knowing her mother and has retarded the development and growth of mutual love and respect. By now placing the child with the mother a

spirit of responsibility, love and admiration would undoubtedly nurture and grow, but if these feelings are to be lost if adversity returns, then little future happiness is promised the baby by being returned to her mother. The real test is the mother's attitude under all circumstances, and, if the present marriage was unsuccessful and the mother was to revert to indifference, the youngster would suffer by the change.

If we were to consider only the past benefits and detriments, the scales would tip in favor of the grandmother. The future is definitely unknown but we cannot escape the conclusion that the love of the real mother is unequalled, even by that of a grandmother, and that future contingencies seem to be better faced by having the daughter reunited with the mother. This tips the scales in her favor. While under this arrangement the daughter will be reared by only one parent, the stepfather has evidenced a parental interest in her and has offered to assist the mother in advancing her welfare. The natural father has remarried, has another family, and has been satisfied to let the child be cared for, directed, and controlled by his mother. He does not seem greatly concerned about the child being reared by someone other than her parents. Whether the child be left where she is or placed with her mother, she has the advantages of being part of a family unit. The mother is conceded to be a fit and proper person to have the care and custody of her child and unless her past conduct brands her as unfit or forfeits her right to claim her own flesh and blood, there is no good reason why her opportunity to become a real mother to her daughter should be longer delayed. As previously stated, the facts related in this opinion are those which are favorable to the grandmother, and yet they do not compel a finding that a continued separation will be for the child's welfare. The poignancy of the grief and the severity of the unhappiness of the child which will be caused by separation from the

grandmother will not be lessened by age. The older the child becomes, the more difficult will be the parting. If a court is ever going to reunite the mother and daughter, the sooner the reunion is effectuated the sooner will the damage be repaired. This does not appear to be one of those cases where it is better to leave well enough alone in the futile hope that an easier solution will present itself.

The judgment is reversed with directions to the trial court to enter judgment awarding custody of the child to her mother. Each party to bear her own costs.

PRATT, C. J., and WADE J., concur.

WOLFE, Justice (dissenting).

Mr. Justice LATIMER has presented the facts in this case clearly and impartially and has persuasively reasoned his conclusion. But I draw different conclusions. My reason is that I think the principle of "leave well enough alone" applies here. Admittedly, we are asked in this case to guess or to prophesy.

I am attempting to give full weight to the fact that the young mother had great difficulties in taking care of the child while her husband was in the Navy and that the sensible arrangement of permitting the grandmother to care for the child during a part of that period should not be taken as an indication of lack of interest or affection for the child. And I am also taking into consideration that this mother contributed to the support of her sick sister while she lived at San Diego and the fact that she was very young when she became a mother. I have no doubt that she was not wholly indifferent to the welfare of the child. Her extreme youth and the fact that she knew the child was in good hands and the difficulty in giving the child proper care while she was working exhibits good sense in doing the practical and best thing for the child during that period of its babyhood. The fact that she was willing to

help in the care and support of a very sick sister and to do such work as a car-hop in order to contribute to support of her family with whom she was living while at San Diego, do not bespeak of an irresponsible person. Even the fact that she did not send any money to grandmother Hardcastle to aid in the support of the child when she was receiving a very tidy sum from her work in the shipyards of Portland and eighty dollars a month from her husband who was then in the Navy, and that it took a Juvenile Court action to obtain a contribution from her, may be attributed largely to youthful lack of consideration for the grandmother to whose care she willingly committed Janet and in whom she had abiding confidence.

Admitting that the mother is a fit and proper person to care for the seven year old Janet as says the main opinion, because of the long separation, the life of each must be built into the life of the other entirely anew, if in fact they were ever close to each other. It is not free from doubt whether this can be done whereas in the case of the daughter and grandmother, it has already been accomplished. True, the grandmother is 47 years of age—not old for these times— but she is not in the position of an old woman long since forgotten to the ways of a young child. She has been continuously in the business of raising young children and Janet has in effect been her youngest. Janet has also become used to the companionship of the children of the grandmother and I think in spite of the usual quarrels and disagreements which are part of the life of children she would sorely miss the companionship and perhaps as much as anything, these childish quarrels and disagreements. Then in addition to the love and care of her foster mother and the companionship of the other children, she would be transported into an entirely new and strange environment from an environment of the farm and the farm animals and the open country, which means much to children who have had the joy of knowing it, compared to the

city home with its comparative confinement. The very so-called hardships of country life, not too severe in this age of mechanical household appliances and modern sanitary conveniences, still serve to inculcate in the child self-reliance in meeting difficulties and an independence and robustness of character which may better train the child for a normal adulthood and marriage, or better fit her for the work-a-day world than the sheltered life in a home of comparative affluence. If this young girl were even ten years old, that is, more advanced in the formative period of its life, she would be more ready to adapt herself to the change and better able to understand the reasons therefor. But this child still greatly needs assured love and affection and must not be subjected to the chance that it will not, because of jealousy or indifference or some other reason—perhaps the type of social life which ample money encourages in some parents—receive its need of affection and sense of belonging.

I recognize that money presents opportunities for advanced education and a certain type of social life, perhaps of the country club type, but if this mother and the new father are sincere in their desires to advance those interests of the child, they may furnish it later or for that matter, take custody of the child at a later date.

I think the main opinion has ably summed up the pros and cons of the situation. I could express them no better. It is that where I see this young child taken from an environment in which it is seemingly happy and transplanted at this early age into a home where the marriage relationship has not reached the point where we can say that it stands a fair chance of lasting, where the nature of its relationship to the stepfather is very uncertain, where the visualized possibilities for more thorough and easier present and advanced education and gracious living are, at the most, speculative and so admixed with chances of only more sophisticated living and miseducation, that I am con-

strained to continue for the time being this life which we know about. To paraphrase an expression from Hamlet, it were better for the child to bear such ills she has than to fly to others we know not of, especially since the ills she has are not of a serious nature and are assuaged by the known affection of Mrs. Hardcastle.

And thus must have concluded the lower court who had a better chance than have we to judge the mother, step-father, and grandmother. He heard all the evidence and had in addition the actors in this human drama before him.

I would favor a decree providing that the mother be allowed to have Janet during the non-school months from now on to the age of choice and that the child at the age of ten be permitted to choose which home it prefers, the choice being aided by the experience during the summer months.

McDONOUGH, J., concurs in the dissenting opinion of Mr. Justice WOLFE.