### DECIDED IN

# THE SUPREME COURT

#### OF THE

# STATE OF UTAH

*(Continued From Volume 60.)*

## KURTZ et ux. v. CHRISTENSEN et ux.

No. 3722. Decided August 17, 1922. Rehearing denied October 4, 1922. (209 Pac. 340.)

1. HABEAS CORPUS—BEST INTERESTS OF CHILD WHOSE CUSTODY IS INVOLVED CONTROLS. In a habeas corpus proceeding between the natural and foster parents of a child, the best interests of the child is always the prime factor, and overshadows all others.

2. HABEAS CORPUS—CHILD GIVEN AWAY BY MOTHER HELD NOT TO BE TAKEN FROM FOSTER PARENTS. Where the father of an illegitimate child enlisted, leaving the mother practically penniless, and the mother, without being importuned to do so by any one, and against the advice of persons sympathizing with her, induced her doctor to give the child away to defendants, who cared for the child through sickness and became much attached to it, and are rearing the child in ideal environments, the child will not be taken from them and returned to its natural parents, who for several years made no attempt to reclaim it, though they have since married and are now desirous of having the child.[1]

---

[1] *Stanford* v. *Gray*, 42 Utah, 228, 129 Pac. 423, Ann. Cas. 1916A, 989; *Hummel* v. *Parrish*, 43 Utah, 373, 134 Pac. 898.

(1)

3. HABEAS CORPUS—ADOPTION PROCEEDINGS ADMISSIBLE IN PROCEED-
ING INVOLVING CUSTODY OF CHILD. In habeas corpus by the
natural parents of a child to obtain its custody from defendants,
to whom the child was given by its mother, the record of adop-
tion proceedings by defendants was admissible, whether the
proceedings were legal or not to show defendants' good in-
tentions.

WEBER, J., dissenting.

Appeal from District Court, Third District, Salt Lake
County; *Ephraim Hanson,* Judge.

Habeas corpus by John P. Kurtz and wife against Otto W.
Christensen and wife. From a judgment for defendants,
plaintiffs appeal.

*Ray Van Cott,* of Salt Lake City, for appellants.

*John F. Bowman,* of Salt Lake City, for respondents.

CORFMAN, C. J.

The plaintiffs, on February 15, 1921, filed in the district
court of Salt Lake county a petition for a writ of habeas
corpus to issue against the defendants, requiring them to
produce before that court an infant child, alleged to have
been wrongfully and unlawfully taken from the custody and
control of its natural mother, the plaintiff Dorothy A. Kurtz.
A writ issued, and in due time a return was made, whereupon
the district court, on May 21, 1921, after hearing the evi-
dence, ordered that the defendants be discharged of the writ,
and that the child be remanded to the care and custody of
the defendants.

The plaintiffs appeal. As grounds for a reversal they al-
lege that the trial court's findings are not supported by the
evidence, that error was committed in the admission of cer-
tain documentary evidence, and that the decree and judgment
are against law.

The findings of the trial court are especially assailed, and,

for the reason that they substantially, if not in detail, set forth the character and relationship of the respective parties and the facts and circumstances out of which this controversy arose, we here set them forth in full.

"(1) That the plaintiffs and the defendants are residents of Salt Lake City, Salt Lake County, state of Utah, and have been such for several years prior to and immediately next preceding the commencement of this action; that the defendants, Otto W. Christensen and Anna B. Christensen, are husband and wife, and have been such since the 6th day of August, 1907, upon which date they intermarried; that the said Otto W. Christensen was born at Draper, Salt Lake county, state of Utah, and is now 35 years of age, and that the said Anna B. Christensen was born at Gunnison, Sanpete county, Utah, and now is 32 years of age; that Otto W. Christensen and Anna B. Christensen have had no children born to them.

"(2) That the plaintiffs became acquainted first in the latter part of 1915, soon after which an illicit sexual relationship commenced and continued until the latter part of 1917, and that about the 1st of September, 1917, a child was conceived, and about two months later the said J. P. Kurtz, at which time he knew that said child had been conceived, entered the military service of the United States and went to France, from whence he returned to Salt Lake City, Utah, on June 13, 1919, and that he and Dorothy Fox, the other plaintiff in the above-entitled cause, intermarried on July 3, 1920, and are now husband and wife.

"(3) That a female child was born out of wedlock to the plaintiffs on the 5th day of June, 1918, at St. Marks Hospital, Salt Lake City, Utah; that the said Dorothy A. Kurtz, then known as Dorothy Fox or Dorothy Lloyd, was 24 years of age, and was then, and for about 3 years prior thereto had been, residing in Salt Lake City, state of Utah; that her mother died when she was about 5 years old, shortly after which she left the place of her birth, Avoca, N. Y., and went to Rochester, N. Y., where she resided with her sister until she came West, in about 1915; that she worked as a housemaid and in restaurants as a waitress from the time she came West until her marriage to the plaintiff, John P. Kurtz.

"(4) That before said female child was born to the plaintiff Dorothy Fox, she decided that she would give it away, and requested her attending physician, Dr. Warren Benjamin, to procure or find suitable parents for the child, who would have it adopted; that this decision on the part of the mother continued and persisted after efforts had been made by various parties to dissuade her from giving the child away; that said attending physician, Dr. Benjamin,

in accordance with the wish of said plaintiff, Dorothy Fox, communicated said wish to the defendants Otto W. Christensen and Anna B. Christensen, his wife, who were anxious to get a baby to adopt; that on the morning of the birth of said child, the defendant Anna B. Christensen, upon receiving notice from Dr. Benjamin, called at said St. Marks Hospital and received said child and that the said Otto W. Christensen and Anna B. Christensen, his wife, have had said child ever since; that they have nursed it through two very serious cases of pneumonia, a case of influenza, and other serious sickness with the utmost care and tenderness, and that said child has become very deeply attached to said defendants, and said defendants have formed a deep love and attachment for said child, and are educating it in the finest Christian virtues and practices, in a fine Christian home and under splendid environment; that said child knows no parents but the defendants; that the defendants are fit and proper persons to have said child, and are well able, financially and otherwise, to support and educate said child.

"(5) That the mother of said child was in good health at the time of the birth of said child, and during her pregnancy, and was in possession of all of her faculties, and knew and well understood what she was doing when arranging for the giving of said child away for adoption, and that neither she nor the other plaintiff, her husband, have made any effort to obtain said child since its birth until about the middle of January, 1921, a few days preceding the commencement of the above-entitled action, and that they have contributed nothing to or towards the support of said child during any of said time, and if it had been their desire to locate the said child during any of the said time it would have been an easy matter for them to have done so.

"(6) That said plaintiffs have willfully deserted and abandoned said child ever since its birth, and that said child has been solely supported and cared for by and in the custody of the said defendants during all of the said time.

"(7) That the welfare of said child will be best promoted and it is for the best interests of said child that it be remanded to and left in the custody and care of said defendants.

"(8) That except as hereinbefore set forth the petition and reply of plaintiffs are untrue; that all of the allegations of defendants' answer and reply herein, except as hereinbefore expressly set forth, are true.

"(9) That the legality of the restraint of said child has not already been adjudicated upon prior proceedings of the same character as the above, and that no application for a writ of habeas corpus has been before made to, or refused by, any court or judge within the state of Utah or elsewhere, affecting the liberty, custody, or control of said child.

"(10) That on the 29th day of July, 1919, said child was legally adopted by the defendants Otto W. Christensen and Anna B. Christensen, his wife, by the name of Catherine Marie Christensen, by an order of the Third judicial district court of Salt Lake City, Salt Lake county, state of Utah, made and entered on the 29th day of July, 1919."

We have read the somewhat voluminous transcript of the evidence in this case with more than ordinary care, and, after doing so, we conclude that the case was tried upon the theory that the best interest of the child should be controlling, and have no hesitancy in saying that the trial court's findings in that regard, in every instance, are supported by substantial, if not by the overwhelming weight of, evidence. Legal controversies in which the right to the care and custody of a little child are involved seldom fail to engender intense feelings on the part of the participants, more especially where there are foster or adoptive parents on the one side and the natural parents on the other. This case in that regard affords no exception. In these cases the duty of the courts to decide fairly and impartially the paramount question—the best interests of the child—is always attended with grave responsibility, and oftentimes is a very difficult matter to determine. After reviewing the record in this case we are satisfied that any extended discussion of the evidence on the part of this court would subserve no good purpose whatsoever. The principles of law controlling are generally understood. The difficulty arises in their application to the facts and circumstances of a given case. Humanity is not the subject of barter and sale. While the courts at times discuss and give some consideration to what is frequently referred to as the equities of the contending parties, nevertheless, in the last analysis, the best interest of the child is always the prime factor in the case, and of necessity overshadows all others.

In this case we are constantly reminded, in the brief and argument of plaintiffs' counsel, that by reason of the fact that the plaintiffs are natural parents the law favors them. It is also contended in plaintiffs' behalf that their social station and their financial ability to care for and properly rear

their own child equal those of the defendants; that these considerations, coupled with the admitted fact that since the birth of the child plaintiffs have become husband and wife and are very much devoted to each other, should have prompted the trial court to overlook all their past indiscretions and to give back to them the child of their own flesh and blood to nurture and rear to womanhood. The entering into of the marriage relation and the present attitude of the plaintiffs toward each other are most commendable. For these things the whole world must applaud. There are, however, other considerations which must enter into the question of determining what is for the best interests of this little child who seems destined to play an important part in the happiness of the lives of the contending parties—things that the plaintiffs, for the time being at least, seem to entirely lose sight of, and which, to the minds of this court, must of necessity give rise to an element of uncertainty while giving consideration to their contention that the trial court erred in deciding that the custody and control of this little one should remain with the defendants. The undisputed facts are that the home environments of this little child are now most ideal. That they will continue to be, and that she will be reared to a splendid womanhood with the defendants, seems assured. She knows no other parents, and her affections are so entwined with theirs that a separation would mean the uprooting of all that makes for the good and happiness of child life. The plaintiffs' previous conduct alone has brought about her present relationship to the defendants. No unbiased mind can read this record and arrive at any other conclusion. At the time she was begotten out of wedlock by the plaintiffs, the mother was a poor working girl absolutely dependent upon her own exertions as a means of livelihood. The plaintiff John P. Kurtz, seemingly without regard or apparent concern for the unborn child, left the mother to shift for herself as best she could. This, too, at a time when he was free to enter the marriage state and had several hundred dollars of savings in a Salt Lake City bank with which he might have provided for and helped to sustain the mother

during the trying ordeal through which he well knew she would have to pass. He entered the World War leaving the mother practically penniless. His excuse for that is that he feared that he might be accused of seeking to evade the draft, and that he might not be able to enlist his services as a soldier for his country in a time of need. We remark: Those fears were not justified, in view of the fact that he could, nevertheless, have enlisted as a married man, and his enlistment would have not only afforded him as a soldier in the service additional compensation by reason of his having a wife and child, but also, in the event of a casualty, an indemnity sum that would have placed them far beyond dependency upon the public or the charity of friends—nay, more than all else, left for mother and child an honored name.

But, for all that the father neglected and failed to do, it may not be rightfully said that the mother was in the least to blame. There are, however, some things connected with her conduct, after she was left in the unfortunate situation she found herself in after the father had left that are not satisfactorily explained by the record before us. The evidence, we think, very clearly shows that she might have retained the custody of the child had she been disposed to do so. No one importuned her to give up her child, nor was there even a suggestion made by any one that it might be best for her to do so. Confronted, as she was, by the very unfortunate circumstances in which she had been left, months before the child was born, she deliberately arrived at the conclusion that it would be for the best to give it away to some good people who would be able to provide it with a proper home, to be cared for and adopted as their own. She confided with and made known her circumstances and her desire for the welfare of her unborn child to Dr. Warren Benjamin, a physician of the highest standing and of splendid reputation. To him she expressed a desire to give her baby away. He, under the circumstances, enlisted the services of his wife, Mrs. Gertrude Benjamin. She, too, became solicitous for the welfare of the unborn, and sought to impress upon Mrs. Kurtz the fact that if she gave the baby

away she might not see it again, and suggested to the mother that it might be placed in the orphans' home. It was then thought that might be done. Mrs. Benjamin, with that end in view, called upon Mrs. Hattie James, a probation officer of the juvenile court of Salt Lake City, and requested her to try and persuade Mrs. Kurtz not to give up the baby. Thereupon Mrs. James called upon Mrs. Kurtz, and explained to her how it could be arranged to take the baby when it was born to the orphanage and have it cared for without one cent of expense, so that she might have it afterwards when she desired. The kind offices of Mrs. James were rejected, and to her Mrs. Kurtz again expressed a desire and determination to give the baby away at its birth. This record is replete with evidence tending to show that Mrs. Kurtz, long before the baby was born, determined for herself that the baby at birth should be taken away from her and given to strangers who would care for it and adopt it as their own. Then, too, it is clearly shown by the evidence that she reached her decision against the advice and counsel of several kindly disposed women, who sympathized with her and endeavored to persuade her that at some future time she might regret it, and that there was no occasion for her, under the circumstances, to part with the control of the child. It was also successfully proven that almost immediately after the birth of the baby she was again asked by Dr. Benjamin, her attending physician, if she still desired to give her baby away, and she responded, according to her own testimony, "What else can I do?" Again, when the baby was placed by her side she ordered the nurse to "take it away" because it was crying. Not until then was it placed in the open arms of the defendant, Mrs. Christensen, who, although a woman without children of her own, nevertheless, if the record here is to be believed, is endowed with those qualities of mind and heart which have impelled her more than once to reach out for the little unfortunate bits of humanity left stranded in the world, to administer to them as only good women can to such little waifs. It further appears from the evidence that after taking this little one she wisely and patiently

waited for over a year for the call of its natural mother before going into court and attempting with her husband to adopt it as their own child. Since receiving this little girl, without knowledge as to whom its natural parents might be, and without desiring to know, the defendants have comforted it and nursed it through sickness when its 2 life was almost despaired of and until now it has become a healthy normal child, with its affections so firmly cemented with theirs that no argument or reasoning can be brought to bear upon this court that will lead us to think that justice and the law now require us to hold that their alliance should be broken.

If as a matter of law there was no abandonment of this child on the part of its natural parents, under the facts and circumstances it would be difficult to conceive how the conduct and expressed intention of parents might constitute an abandonment. The mother knew her child was to be given away. She directed her physician to do that which he did do. She made no reservation of a right to reclaim her baby. No conditions whatever were imposed upon those who were to receive it. Undoubtedly she had full confidence in Dr. Benjamin that he would see to it that her baby was placed with good people who would love and adopt it as their own. That confidence has not been betrayed. True, some four or five weeks after Mrs. Kurtz had left St. Marks Hospital where she had been confined she made some inquiry of Dr. Benjamin concerning the baby's whereabouts, but nothing was said that would lead any one to believe that she seriously thought of reclaiming it. Even long after that, when she was advised that able and reputable attorneys had expressed an opinion that she might recover her baby, she took no action, nor until the watchful waiting of its foster parents led them to believe that no claim would ever be made for it against them, and, as a matter of duty and right, they had been impelled to go before the district court and attempt to adopt it as their own on the theory that it was an abandoned child. At that time the defendants did not know, and had no means of ascertaining, the names of the natural parents.

The reasons why the defendants did not seek to be informed are too obvious in a case of this kind to have need of discussion. It must suffice to say that under the facts and circumstances it would have been better for the peace and happiness of all parties immediately concerned, including the child, had the names of the natural parents not been brought to light.

As has been said, the principles of law applicable to the facts and circumstances of this case are well understood. They have already been announced by this court in *Stanford* v. *Gray*, 42 Utah, 228, 129 Pac. 423, Ann. Cas. 1916A, 989, and in *Hummel* v. *Parrish*, 43 Utah, 373, 134 Pac. 898, particularly the latter case, wherein it was held, quoting from the syllabus:

"Though the presumption is that it is for the best interests of a child and of society that it shall remain with its natural parents during minority [nevertheless] where a parent has surrendered her child to others in infancy and it has been allowed to remain with others until new ties of mutual affection are formed, the child's welfare will control the parent's rights in habeas corpus proceedings for its return."

The impulses of the plaintiffs to regain possession of their child are most natural. After reading this record one can readily concur in the findings of the district judge, who in passing upon the facts of the case commented that—

The plaintiff, Mrs Kurtz, "would make a commendable mother to this child, but the welfare of the child is better subserved and will be better promoted with the Christensens than with its natural parents."

The plaintiffs should bear in mind that it was their shortcomings that brought about this unhappy condition of affairs, and bear the burden of it all uncomplainingly. Their consolation should be that it is now for the best interests of their child that it remain with the splendid people who provide for it and love it as their own, precisely as its mother designed when she thought that such would be for the best.

We have pointed out that in the trial of this case the district court proceeded upon the theory that the best interests of the child should be subserved. The defendants were

Certiorari

permitted, over plaintiffs' objections, to introduce the        **3**
record of adoption proceedings taken by them before
the district court, and the trial court also made a finding that
the adoption proceedings theretofore had were legal.   That
is also complained of as error.

Without passing upon the legality of the adoption proceed-
ings they were competent evidence for the purpose of showing
that defendants were assuming a right attitude toward the
child, and that their intentions were of the best.   The evi-
dence was therefore properly received for that purpose if
for no other.

Therefore, upon the sole ground that the best interests of
the child will be the better subserved by its custody remaining
with the defendants, the judgment of the district court will
stand affirmed.   Defendants to have their costs.

GIDEON, THURMAN, and FRICK, JJ., concur.

WEBER, J., dissents.