383 P.2d 925

**Orville Y. WILSON and Norma W. Wilson, his wife, Petitioners and Respondents,**

**v.**

**Ruth Eleanor PIERCE, Objector and Appellant.**

**No. 9756.**

Supreme Court of Utah.

July 23, 1963.

Young, Thatcher & Glasmann, Ogden, for appellant.

Wallace, Adams & Peterson, Ogden, for respondents.

CROCKETT, Justice.

Orville Y. and Norma W. Wilson filed a petition for the adoption of Linda Lee Wilson, a child who will be five years old November 15, 1963. The child's mother, Ruth Eleanor Pierce, filed objections and also invoked the aid of habeas corpus to obtain custody. After plenary trial the court found that the child was deserted and abandoned by its mother when placed with the Wilsons; that she had led them to believe that the arrangement would be permanent; that it was for the best interests of the child that she be adopted by them, and granted the adoption. Objector, Mrs. Pierce, appeals, challenging each of the grounds stated.

The custody of this child being involved, a primary concern is for her interest and welfare and rights of the contesting adults are but secondary. Such proceedings are equitable in nature.[1] In fact, because of the bearing they may have on the entire course of the life of the child, they are sometimes said to be equitable in the highest degree,[2] and the court will

1. Walton v. Coffman, 110 Utah 1, 169 P.2d 97.

2. Ibid, In re Adoption of D———, 122 Utah 525, 252 P.2d 223.

scrutinize the proceedings with especial care in the interest of the child. Though it is appreciated that this court has stated that the evidence must be clear and convincing that a parent has abandoned his child,[3] whether the requisite degree of proof has been met is left largely to the trial court.[4] Because of his close contact with the parties and the opportunity it affords him to form a judgment not only of their veracity, but of their qualities of character and sincerity of purpose, which are particularly important factors in proceedings of this kind, we make due allowance for his advantaged position; and in accord with the traditional rule, review the evidence in the light most favorable to the findings and decree; and will not disturb them unless it is shown to clearly preponderate to the contrary.[5]

The child, Linda Lee Wilson, was born November 15, 1958, at Joplin, Missouri, to the objector, then Ruth Eleanor Bresnan. She had been married to John Bresnan and they had one child. At the time of her divorce from John she was in the embarrassing situation of being pregnant by another man. She did not want to face the problems having this child would present, so she resolved to maintain secrecy about her pregnancy and to let someone else have it. To accomplish this she left her mother's home at Springfield, Missouri, and went to Joplin. She concealed her whereabouts even from her mother, advising her that she was working in Chicago. All letters written to her mother were sent to a friend in Chicago, who acted as an intermediary in receiving and posting the letters.

In order to carry out her plan, prior to Linda's birth, she contacted a couple in Texas, a Mr. and Mrs. Robert Butkus, and offered them the child for adoption. She warned them that secrecy must be maintained; indicated that she would be willing to sign papers herself; but said she would not consider letting them have the child if her former husband had to be told about her predicament and be required to sign papers. The Butkuses informed her that they were advised by an attorney that the signature of the father would be necessary; and they declined to take the child.

Further pursuing her plan, Mrs. Pierce then contacted the Wilsons in Ogden, Utah; and offered the child to them. The evidence shows that she knew that it had been the Wilsons' desire of many years to have children; that they had previously had children in their home on a temporary basis whom they had had to give up, which was a very trying experience and which

3. In re Walton, 123 Utah 380, 259 P.2d 881.
4. See statement in Child v. Child, 8 Utah 2d 261, 332 P.2d 981.

5. See Nokes v. Continental Mining & Milling Co., 6 Utah 2d 177, 308 P.2d 954.

they did not want to repeat; that Mrs. Pierce stated that she wanted only to have someone take the child; and that if the Wilsons would do so, they could expect no trouble from her. The objector made known her requirement of secrecy, stating that she had kept it from her mother and her friends; and that she wanted the Wilsons to particularly avoid letting her father and her brother, who lived in Ogden near the Wilsons, know anything about the matter. However, she told them that according to advice she had received from Texas, the child could not be adopted for two years without the father's consent, but that after that time only the signature of the mother would be necessary. She stated that "outright adoption" would thus be impossible until after the two years had elapsed. It should be stated that such is not the law of our state, and this has no relevance in this case except that it is in accord with the petitioners' evidence and the finding of the trial court that the objector was abandoning the child; and that the petitioners were to take her as their own and adopt her as soon as the law would permit.

The understanding having been arrived at, Mrs. Pierce sent a telegram just before the expected birth, advising the Wilsons of the approximate date. Mrs. Wilson flew to Joplin, and the day after the child was born went to see Mrs. Pierce at the hospital to arrange to take the child. A detail indicative of the intent is that Mrs. Wilson told Mrs. Pierce that because of their fondness for a boy named Lee, and a girl named Linda, whom they had had in their home, they desired to name the child Linda Lee Wilson, which was also agreed to.

Mrs. Pierce signed a homemade document which stated that she authorized the Wilsons, " * * * to take my baby, Linda Lee Bresnan, * * * out of the state of Missouri. I also give my consent that the child may go by the name of Wilson until of legal age * * *." and concluded that "they may raise the child as they see fit with my complete consent."

When Linda was four days old Mrs. Wilson brought her home to Ogden, where they have since given her the utmost of loving care, without help or hindrance from the objector until shortly before the commencement of this action. Meanwhile, in 1959, the year after Linda's birth, objector married her present husband, William Pierce, Jr. By this marriage she is now the mother of a third child.

In August of 1960 Mrs. Pierce came to Utah and visited with her father and brother. She arranged to call on the Wilsons at night, and saw Linda, but took care to keep the secret of Linda from her relatives. Nothing was then said to inform the Wilsons that the same arrangements they had agreed upon would not continue and be carried out. Later, in Decem-

ber of 1960, the objector and her new husband came to Utah, at which time she indicated to the Wilsons a desire to reclaim the child, and stated that she would want to take her in March of 1961. The Wilsons thereupon consulted an attorney, who brought this proceeding, resulting in the judgment appealed from.

■ Mrs. Pierce contends that the writing referred to above by which she relinquished the child is invalid as a consent for adoption because it is in violation of Secs. 55–8–2(c) and 55–8–3, U.C.A.1953, and urges that an adoption cannot be based upon such an illegal consent. The significant fact here is that the adoption is not grounded upon the written consent as such. Sec. 78–30–5, U.C.A.1953, provides that a deserted child may be adopted without the consent of its parents. This is a practical necessity which the law wisely recognizes for the relief of children who might be abandoned to a worse fate than being so rescued. In the interest of encouraging rescue and care of children left without parental refuge, it is not the policy of the law to impose undue hazards upon people disposed to come to their aid by leaving them at the mercy of the whim or caprice of a natural parent who has abandoned his child.[6]

In arguing against the finding that she deserted the child, objector places reliance on the language of Jensen v. Earley[7] as implemented by the cases of Taylor v. Waddoups[8] and In re Adoption of Walton[9] to the effect that:

"Abandonment, in such cases ordinarily . means that the parent has placed the child on some doorstep or left it in some convenient place in the hope that someone will find and take care of it, or has abandoned it entirely to chance or fate. To make arrangements beforehand with some proper and competent person to have the care and custody of the child is not an abandonment of it as that term is ordinarily understood."

■ We see no reason for disagreement with the language as applied to the particular fact situations. But it was not meant to prevent a finding of the true facts where there has been an actual desertion or abandonment. A distinction should be made between leaving a child under circumstances which show a continuing intention to fulfill the duties of parenthood by seeing to it that the child is cared for and of possibly resuming such responsibility if that becomes necessary; as distinguished from an intent to completely and perma-

6. See statement in In re Adoption of D————, footnote 2 above, at pp. 229 and 230 of 252 P.2d.

7. 63 Utah 604, 228 P. 217.
8. 121 Utah 279, 241 P.2d 157.
9. Footnote 3, supra.

nently abandon a child and parental responsibilities to it. Where there is in fact the latter type of abandonment, it matters not whether it is to a situation where others may be expected to care for the child, or it is left to the mere chance of whatever fate might befall it. Whether there has been such an abandonment and what is to be done with the child depends upon the facts and circumstances of each case.[10]

Jensen v. Earley, supra, is not discordant to this view but is in harmony with it as is manifest by this statement in the opinion referring to the case of Kurtz v. Christensen:[11]

"The reason why this court arrived at a different conclusion in the Kurtz Case was because the circumstances were different, and in that case the question of the best interest of the child constituted a large, if not controlling, factor. We are therefore clearly of the opinion that under the peculiar facts and circumstances of this case the plaintiff cannot be held to have abandoned her child so as to deprive her of the right to reclaim it in a proceeding of this kind."

The Kurtz case is closely analogous to the instant one. There an unwed mother had asked her doctor to find foster parents for her child, which was done, and they kept the child for two and a half years, when the mother, who had married the natural father, sought to regain her child. In ruling for the foster parents, the trial court placed great emphasis upon the welfare and happiness of the child, stating that while the courts give some consideration to the interests of the contending parties,

"nevertheless, in the last analysis, the best interest of the child is always the prime factor in the case, and of necessity overshadows all others. * * * [this child] knows no other parents, and her affections are so entwined with theirs that a separation would mean the uprooting of all that makes for the good and happiness of child life. * * * [her] affections [are] so firmly cemented with theirs that no argument or reasoning * * * will lead us to think that justice and the law now require us to hold that their alliance should be broken."

As is quite usual in these cases, the contending parties sought to disparage each other as unfit to rear this child. While there was some evidence in support of their respective accusations, it must be appraised in the light of the facts that the parties felt obliged to engage in such re-

10. See In re Adoption of D————, footnote 2 above.

11. 61 Utah 1, 209 P. 340.

criminations; and that we are not dealing with angels, but with human beings who are prone to frailty. In spite of these efforts to show to the contrary, we say advisedly that there was nothing brought out by either party to create any real concern that the other was actually unfit to have the child's custody.

It is quite needless to make a villain out of this young woman (Mrs. Pierce) to justify this obviously correct judgment. Regardless of errors of the past; and her sincere, even if in our judgment unwise, attempt to change her mind and reclaim the custody of this child, it serves no useful purpose to question her qualifications as a parent; and the trial court properly refused to make a finding that she was unfit. The same consideration can, with full justification, be indulged for the Wilsons, notwithstanding efforts made to discredit them because of the facts: that they are so old (in their early 40's) that according to the social agencies they are marginal as to age for adoptive parents; that they may have had some health problems; that they are "Mormons" and therefore objector alleges have some "odd beliefs"; that Mr. Wilson seems to be on the rough-hewn side and at times embellishes his language with some colorful, if not socially delicate, adjectives known as "swear words"; and has been known to tell ribald stories. Perhaps it is not amiss to observe that it is fortunate for a considerable segment of the population that this latter frailty, while maybe not to be commended, does not entirely disqualify one as a parent. Despite these dire indictments against them, the Public Welfare's Adoption Study Report states that the Wilsons are " * * * good adoptive parents," which is in accord with the conclusion of the trial judge.

█ In view of the above discussion of the other points, which provide a sound foundation for the trial court's action, it is unnecessary to give any serious concern to the issue of estoppel. We have heretofore discussed that matter in a case of this character.[12] Whatever import it might have here favors the petitioners. It seems unquestionable that they were led to believe that they could have this child and in reliance thereon have invested not only much time, effort and money, which are the mere material things, but the far more precious one of lavishing their affections upon her without reserve so that in the most real sense they have gotten into a position from which they can never extricate themselves.

Another facet of this case, which undoubtedly had at least some weight with

---

12.  In re adoption of D———, footnote 2, supra.

the trial court, and which we are pleased to realize, is that Mrs. Pierce is not, as some mothers have been in attempting to reclaim their children, entirely forlorn. She represents, and the fact appears to be, that she now has embarked on a successful and happy marriage in which she has an adequate home, a loving husband and two lovely children. Those fortunate circumstances should provide her some comfort for her failure to be able to reclaim Linda. Further, as was well pointed out in the Kurtz case, she should not forget that it was her own doings, and not that of the petitioners, that brought about the present difficulties. But she can take consolation in the fact that she has made her attempt to make amends to Linda for the past, and that upon a full survey of the situation, what we regard as a competent and wise trial judge, has now decided that it is for the best interests of Linda to remain with these people who will give her a home, and love and provide for her as their own, precisely as she planned when she herself thought that would be for the child's best interest and welfare.

Judgment affirmed. No costs awarded.

HENRIOD, C. J., and CALLISTER, McDONOUGH, and WADE, JJ., concur.