262 P.3d 955 (2011)
In re the Parental Responsibilities of S.M.J.C., Oglala Sioux Tribe Ontrac, Intervenor-Appellant, and
Concerning Constance Ann Crawford, Appellee.
No. 10CA0889.
Colorado Court of Appeals, Div. IV.
April 14, 2011.
*956 Jill Tompkins, Boulder, Colorado, for Intervenor-Appellant.
*957 Lorina and Lesna, LLP, Elizabeth Lorina, Rapid City, South Dakota, for Appellee.
Opinion by Judge NEY.[*]
In this allocation of parental rights proceeding, the Oglala Sioux Tribe (the Tribe), acting through the Oglala Nation Tiospaye Resource Advocacy Center (ONTRAC), appeals from the order denying its motion to dismiss the proceeding pursuant to 25 U.S.C. § 1911(a), or, in the alternative, transfer the proceeding to the Tribe's tribal court pursuant to 25 U.S.C. § 1911(b). We conclude that the record does not support the trial court's finding that the child had been abandoned, and thus, the record does not support the court's determination that the child's domicile was that of his caregiver rather than that of his custodial parent. Accordingly, we vacate the order and remand the case to the trial court for further proceedings.

I. Background
S.M.J.C. was born on November 24, 1998, to Latoya Lynn Fast Horse (mother), an enrolled member of the Tribe, and Dennis Cross, Jr. (father), whose membership in the Tribe was reported to be "pending" as of March 2010.
Mother and father were divorced in 2006 by the tribal court. Under the terms of the amended divorce decree, mother was to have custody of the couple's four children and father was permitted to have visitation "only with permission of [mother] and only when he is sober."
In October 2007, father, S.M.J.C., his older brother, possibly other siblings, and S.M.J.C.'s mother were in Denver, living in a van. Father asked Constance Ann Crawford, a Denver resident, if they could stay with her for a while because the weather was cold, and she agreed. The family subsequently moved out, but Ms. Crawford offered to keep the older boys and put them in school. Father agreed to this, and on October 30, 2007, he signed a document purporting to give guardianship of S.M.J.C. and his older brother, M.R.C., to Ms. Crawford, who was said to be "like their grandmother." On November 26, 2007, mother signed a similar document. She stated that she had sole custody of the children; that she had been ill; that she knew that the children were "safe, happy, and ha[d] good care" with Ms. Crawford; and that she was in "constant communication" with her sons and believed that they were well taken care of.
M.R.C. did not remain in Ms. Crawford's home. However, S.M.J.C. was still there in October 2009, when Ms. Crawford petitioned the Colorado court for an allocation of parental responsibilities for the child. She alleged that mother had not seen the child for approximately three years; that father had not seen him since April 2008; that the child needed substantial orthodontic work that would require years to be completed; and that it would be in the child's best interests to allocate parental responsibilities for the child entirely to her. At the same time that she sought a permanent allocation of parental responsibilities, she requested a temporary allocation of parental responsibilities under section 14-10-108, C.R.S.2010, asserting that this was needed because mother had communicated to her that she planned to remove the child from Colorado. Ms. Crawford stated that any such move would reverse the progress made in the child's orthodontic treatment, cause the child severe emotional distress, and potentially cause educational setbacks. The court ordered that the child should remain in Colorado pending resolution of this action.
Ms. Crawford gave notice of her action to the Tribe. In November 2009, the tribal court gave temporary custody of the child to ONTRAC, and in December, ONTRAC moved to intervene in the Colorado proceeding and requested dismissal of the case, arguing that the tribe had exclusive jurisdiction over the matter under 25 U.S.C. § 1911(a) because the child's domicile followed that of his parents, which was the Pine Ridge Indian Reservation (the reservation). Alternatively, ONTRAC argued that even if the tribe did *958 not have exclusive jurisdiction, there was no good cause to deny transfer to the tribal court under 25 U.S.C. § 1911(b).
Following a hearing on the motion, the Colorado court found that the child had been abandoned by his parents to Ms. Crawford, and that this had changed his domicile to Colorado. The court also found that there was good cause to deny ONTRAC's request to transfer the case to the tribal court because Colorado was a more convenient forum, because the child had expressed a desire to remain in Colorado, and because the child was receiving sophisticated medical and dental treatment in Colorado. ONTRAC now appeals from the Colorado court's order.

II. Domicile and Exclusive Jurisdiction
ONTRAC contends that the trial court erred in denying the Tribe's motion to dismiss the proceeding pursuant to 25 U.S.C. § 1911(a). ONTRAC argues that because parental rights had not been terminated, the parents' domicile was the child's domicile, and that the court erred in finding, in accordance with the reasoning of the Illinois Supreme Court in In re Adoption of S.S., 167 Ill.2d 250, 212 Ill.Dec. 590, 657 N.E.2d 935 (1995), that the child's domicile was not that of his parents because his parents had abandoned him. We conclude that further proceedings are needed to determine the child's domicile.

A. The ICWA and Tribal Jurisdiction
It is undisputed that the child is an Indian child and that the Indian Child Welfare Act of 1978, 25 U.S.C. §§ 1901-1963 (the ICWA) applies to this case. Our analysis begins with the ICWA and the concerns that it is intended to address.
In Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 32, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989), the United States Supreme Court observed that the ICWA was enacted because of "rising concern" about
the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.
During the hearings on the bill that became the ICWA, Mr. Calvin Isaac, Tribal Chief of the Mississippi Band of Choctaw Indians, had testified:
One of the most serious failings of the present system is that Indian children are removed from the custody of their natural parents by nontribal government authorities who have no basis for intelligently evaluating the cultural and social premises underlying Indian home life and childrearing. Many of the individuals who decide the fate of our children are at best ignorant of our cultural values, and at worst contemptful of the Indian way and convinced that removal, usually to a non-Indian household or institution, can only benefit an Indian child.
Id. at 34-35, 109 S.Ct. 1597 (citing Hearings on S. 1214 before the Subcommittee on Indian Affairs and Public Lands of the House Committee on Interior and Insular Affairs, 95th Cong., 2d Sess., at 191-92 (1978)).
One particular point of concern was the failure of non-Indians to understand the role of the extended family in Indian society. As Senator Abourezk observed at the conclusion of the 1974 Senate hearings:
We've had testimony here that in Indian communities throughout the Nation there is no such thing as an abandoned child because when a child does have a need for parents for one reason or another, a relative or a friend will take that child in. It's the extended family concept.
Holyfield, 490 U.S. at 35 n. 4, 109 S.Ct. 1597 (citing Hearings before the Subcommittee on Indian Affairs of the Senate Committee on Interior and Insular Affairs, 93d Congress, 2d Sess., at 473 (1974)). The ICWA was enacted in part to address the problems that resulted when non-Indian social workers, judges, and others, misunderstanding the Indian concept of "extended family," interpreted a parent's entrustment of an Indian child to a relative or friend as abandonment of the child.
To protect the rights of Indian children and families, as well as the rights of the tribes themselves, the ICWA has established *959 a dual jurisdictional scheme in which jurisdiction is preferentially assigned to the tribal court.
As pertinent here, under 25 U.S.C. § 1911(a), the tribal court exclusive jurisdiction
over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law.
Under 25 U.S.C. § 1911(b), the tribal court and the state court have concurrent jurisdiction over custody proceedings involving an Indian child not domiciled or residing within the reservation. In a proceeding in state court,
the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe[,] [p]rovided, [t]hat such transfer shall be subject to declination by the tribal court of such tribe.
25 U.S.C. § 1911(b).

B. Domicile and Abandonment
ONTRAC maintains that the tribal court has exclusive jurisdiction because the child is domiciled on the reservation, where both of his parents are domiciled. Ms. Crawford argues that although a child normally takes the domicile of his parents, that rule does not apply here because the child has been abandoned by his parents. She contends that because she stands in loco parentis to him, he shares her domicile in Denver. Thus, we must next address the question of the child's domicile.
"Domicile" is a term that is not defined in the ICWA. In Holyfield, the Supreme Court considered whether Congress intended to give content to this term by the application of state law. The court began its analysis "with the general assumption that `in the absence of a plain indication to the contrary,. . . Congress when it enacts a statute is not making the application of the federal act dependent on state law.'" 490 U.S. at 43, 109 S.Ct. 1597 (quoting Jerome v. United States, 318 U.S. 101, 104, 63 S.Ct. 483, 87 L.Ed. 640 (1943); NLRB v. Natural Gas Util. Dist., 402 U.S. 600, 603, 91 S.Ct. 1746, 29 L.Ed.2d 206 (1971); Dickerson v. New Banner Inst., Inc., 460 U.S. 103, 119, 103 S.Ct. 986, 74 L.Ed.2d 845 (1983)). One reason for this rule of construction is that federal statutes are generally intended to have uniform nationwide application, and a second reason is that there is a danger that a program established by federal law may be impaired if state law controls the definition of a key term. Holyfield, 490 U.S. at 43-44, 109 S.Ct. 1597.
Applying this rule of construction to the ICWA, the Court considered first the purpose of the statute, and observed that in view of the fact that the purpose of the ICWA was to make clear that in certain situations state courts do not have jurisdiction over child custody proceedings, it was "most improbable" that Congress would have intended to leave the scope of the ICWA's jurisdictional provisions subject to definition by state courts as a matter of state law. Id. at 44-45, 109 S.Ct. 1597. The Court also was not persuaded that Congress would have intended the lack of nationwide uniformity that would result from state law definitions of domicile. Id. at 45, 109 S.Ct. 1597. The Court concluded that it was "beyond dispute" that Congress intended a uniform federal law of domicile for the ICWA.
While the Supreme Court rejected the use of state law to define "domicile" for the purpose of determining jurisdiction under the ICWA, it did not forbid the use of "general state law principles" to determine the meaning of the word. Id. at 47, 109 S.Ct. 1597. The Court noted that "[w]ell-settled state law can inform our understanding of what Congress had in mind when it employed a term it did not define." Id. Therefore, the Court concluded that "established common-law principles of domicile" could be consulted in determining the meaning of the term, "to the extent that they are not inconsistent with the objectives of the congressional scheme." Id. at 47-48, 109 S.Ct. 1597.
*960 The "established common-law principles of domicile" that the Supreme Court relied upon in determining the meaning of domicile in Holyfield are stated in the Restatement (Second) of Conflict of Laws § 22 (1971), which concerns the domicile of minors. The general rule is that a child has the same domicile as the parent with whom he lives. If the child's parents are separated or divorced, the child has the domicile of the parent who has been given custody of the child, or, if custody has not been assigned to either parent, then the child has the domicile of the parent with whom he lives. Restatement § 22 cmt.d. If the child has been abandoned by his parents and no guardian has been appointed, then "[a]bsent some compelling rule to the contrary," the child's domicile should be in the place to which he is most closely related. Thus, the child's domicile in such circumstances should be with the person who stands in loco parentis to the child and with whom he lives, even if that person is not a blood relative. Restatement § 22 cmt. i.

C. The Principles of Domicile Applied in Three Cases
Since the enactment of the ICWA, the principles described above have been applied in three ICWA cases: Holyfield; In re Adoption of Halloway, 732 P.2d 962 (Utah 1986), a case that preceded Holyfield and was cited with approval by the Holyfield majority; and In re Adoption of S.S. We will consider each.
In Halloway, the Utah Supreme Court considered whether a child, born to a Navajo mother and resident on the Navajo reservation for the first six months of his life, acquired an off-reservation domicile when an aunt removed him to Utah with the oral consent of his mother, and his mother subsequently consented to the child's adoption by a non-Indian couple. A Utah trial court concluded that the child was domiciled in Utah, rather than on the Navajo reservation, because the relocation of the child was done with the intent to transfer full parental rights to the adoptive couple and with the intent to abandon all parental rights in the child. The court also concluded that the adoptive couple stood in loco parentis to the child. Halloway, 732 P.2d at 963-64.
The Utah Supreme Court vacated the trial court's ruling. The problem identified by the court was the interrelationship of Utah's domicile law and its abandonment law, which operated to deprive the Navajo Nation of the exclusive jurisdiction over the child that the ICWA otherwise conferred upon it. The court concluded that this interplay between domicile and abandonment law had not been foreseen by Congress; that to the extent that Utah abandonment law operated to permit the child's mother to change his domicile as part of a scheme to facilitate his adoption by non-Indians while remaining a domiciliary of the reservation herself, it conflicted with and undermined the ICWA and weakened considerably the tribe's ability to assert its interest in its children; and that under such circumstances, the Utah law was superseded by the ICWA. Id. at 968-70. The court explained that
[b]y relying on the Utah definition of domicile, but ignoring, for ICWA purposes only, the effect abandonment has on that definition, we are complying with what we determine to be Congress's intent that tribal courts have exclusive jurisdiction in child custody cases over the minor children of their reservation domiciliaries.
Id. at 970.
In Holyfield, the United States Supreme Court applied the principles set forth in the Restatement to determine the domicile of twin infants whose unmarried parents were enrolled members of the Mississippi Band of Choctaw Indians (the Choctaw Tribe) and residents and domiciliaries of the Choctaw reservation. The children's mother gave birth off the reservation, and both parents promptly executed consent-to-adoption forms. The children's adoption was finalized less than two weeks later. Holyfield, 490 U.S. at 37-38, 109 S.Ct. 1597. When the Choctaw Tribe moved to vacate the adoption decree on the ground that it had exclusive jurisdiction under the ICWA, the Mississippi trial court denied the motion, noting that the children's mother had gone to some trouble to see that the children were born off the reservation and promptly adopted, and the *961 children themselves had never resided on or been physically present on the reservation. The Mississippi Supreme Court affirmed, concluding, as pertinent here, that the children did not share their parents' domicile because they had been "voluntarily surrendered and abandoned" by their parents. Id. at 39-40, 109 S.Ct. 1597.
The Supreme Court rejected the reasoning of the Mississippi courts. The majority held that even though the children had never been on the reservation, at birth they were domiciled on the reservation because their parents were domiciled there. The majority acknowledged that the Mississippi Supreme Court's statement that the children had "at no point" been domiciled on the reservation might be a correct statement of Mississippi law, but concluded that such a result must be rejected because "it is inconsistent with generally accepted doctrine in this country and cannot be what Congress had in mind when it used the term in the ICWA." Id. at 48-49, 109 S.Ct. 1597. The majority then concluded that "voluntary surrender" of the children by their mother could not change the children's domicile because "[t]ribal jurisdiction under § 1911(a) was not meant to be defeated by the actions of individual members of the tribe." Id. at 49, 109 S.Ct. 1597. Citing Halloway with approval, the majority agreed with the Supreme Court of Utah that the law of domicile used in an ICWA case could not permit an individual reservation-domiciled tribal member to defeat the tribe's exclusive jurisdiction by giving birth and placing the child for adoption off the reservation, which would, to a large extent, nullify the purpose the ICWA was intended to accomplish. Id. at 51-53, 109 S.Ct. 1597.
In S.S., the Illinois Supreme Court was asked to determine the domicile of two children for the purpose of determining jurisdiction under the ICWA. The children's mother was an enrolled member of the Fort Peck tribe and a resident of the Fort Peck reservation in Montana. The children were enrolled members of the tribe, like their mother, but sole physical custody of the children had been granted to their father, and until his death, they had resided primarily with him in Illinois. Following their father's death, paternal relatives filed a petition to terminate the mother's parental rights and adopt the children. They charged that the children had been abandoned by their mother during the two years prior to the adoption proceedings. The mother and her tribe responded with substantially identical motions to transfer jurisdiction of the adoption proceeding to the Fort Peck tribal court. They argued that because she was the children's sole remaining parent, her domicile was the children's domicile. S.S., 212 Ill.Dec. 590, 657 N.E.2d at 937-39.
The Illinois court acknowledged that upon the death of the children's father, their domicile would normally have reverted to that of their mother. Citing Holyfield and Halloway, the court also acknowledged that the doctrine of abandonment cannot be used by Indian parents as part of a scheme to facilitate the adoption of their children while they remain domiciliaries of the reservation, because that would undermine the purpose of the ICWA. However, the court concluded that the common law abandonment doctrine could "do no possible violence to the purposes of the [ICWA]" where there was no such scheme. Accordingly, if the children had been abandoned by their mother, their domicile would remain in Illinois even after their father's death and the Illinois court would have concurrent jurisdiction along with the tribal court over the adoption proceeding. Id. at 942-43.

D. The Principles of Domicile Applied in this Case
Here, the Colorado trial court determined that S.M.J.C. had been abandoned by his parents. Applying the reasoning of the Illinois Supreme Court in S.S., the court concluded that because the parents had abandoned the child, his domicile was that of the person with whom he lived, Ms. Crawford. On the ground that the tribal court would be an inconvenient forum, the court then denied ONTRAC's motion to dismiss the Colorado proceeding. We conclude that the record does not support the court's finding that the child had been abandoned, and thus, the record does not support the court's conclusion *962 that his domicile was that of Ms. Crawford.

1. Abandonment
We begin our analysis by observing that "abandonment," like "domicile," is a term that is not defined in the ICWA. Indeed, the term "abandonment" does not appear in the ICWA at all. Nevertheless, because abandonment of an Indian child by his parents may result in a change in the child's domicile, and thus, determine whether the child's tribe has exclusive jurisdiction in proceedings concerning the child's custody, we must determine the meaning of the term "abandonment" for the purpose of applying 25 U.S.C. § 1911(a).
As we have noted above, the Supreme Court has determined that "well-settled state law" may be consulted in an effort to understand what Congress had in mind when it employed a term that it did not define in the ICWA. Holyfield, 490 U.S. at 47-48, 109 S.Ct. 1597. Although the majority in Holyfield did not attempt to determine the meaning of "abandonment," Justice Stevens, in his dissent, cited the Restatement (Second) of Conflict of Laws § 22 comment e and Halloway, 732 P.2d at 966, for the proposition that "[a]n abandonment occurs when a parent deserts a child and places the child with another with an intent to relinquish all parental rights and obligations." Id. at 62, 109 S.Ct. 1597.
Abandonment has been similarly defined by the courts of a number of states. In Colorado, where "abandonment of a child" is not defined by statute, another division of this court recently defined "abandonment" as "the act of leaving a spouse or child willfully and without an intent to return." In re J.A.V., 206 P.3d 467, 468 (Colo.App.2009) (quoting Black's Law Dictionary 2 (8th ed. 2004)); see also Glendinning v. McComas, 188 Ga. 345, 3 S.E.2d 562, 563 (1939) (it is generally held that abandonment must show a settled purpose to forgo all parental duties and claims); Moss v. Vest, 74 Idaho 328, 262 P.2d 116, 119 (1953) (there can be no abandonment without a specific intent to sever all correlative rights and duties incident to the relationship of parent and child), superseded by Idaho Code Ann. § 16-2005 (establishing a less demanding standard), as recognized in Doe I v. Doe, 71 P.3d 1040, 1049 (2003); O.S. v. C.F., 655 S.W.2d 32, 34 (Ky.Ct.App.1983) (generally, abandonment is demonstrated by facts or circumstances that evince a settled purpose to forgo all parental duties and relinquish all parental claims to the child); In re Adoption of SMR, 982 P.2d 1246, 1249 (Wyo.1999) (in order for a willful abandonment of a child to occur, there must be clear and convincing evidence of an actual intent to terminate the parental ties and a purpose to relinquish parental ties).
As noted, that one of the concerns that led to the enactment of the ICWA was the failure of many non-Indians to understand the Indian concept of "extended family." See Holyfield, 490 U.S. at 35 n. 4, 109 S.Ct. 1597 (quoting comments of Senator Abourezk). Because cultural misunderstanding has the potential to cause a non-Indian court, applying non-Indian law, to find that a child has been "abandoned" in circumstances in which the child's tribe would find that no abandonment has occurred and that the child is receiving appropriate care from a friend or family member, abandonment law must be employed with great caution in making decisions that will determine whether a tribe does or does not have exclusive jurisdiction. In cases in which a child has been "abandoned" for the specific purpose of evading the ICWA, the purported abandonment must, of course, be disregarded. In other cases, however, we conclude that the careful application of the common law concept of abandonment, as defined and explained in the cases cited above, is not likely to lead to such cultural misunderstandings, and thus, is not likely to result in a finding that an Indian child has been abandoned in circumstances in which such a finding would frustrate the purposes of the ICWA. Accordingly, we further conclude that the common law concept of abandonment may be employed in this case to determine whether the child has been abandoned so as to change his domicile for the purpose of determining jurisdiction under the ICWA.

*963 2. S.M.J.C. Was Not Abandoned by Mother
Abandonment is primarily a question of intent. J.A.V., 206 P.3d at 468. The trial court must examine the totality of the circumstances, and may not find abandonment unless the totality of the circumstances shows that the natural parent has left the child willfully without an intent to return. Id.
A parent's placement of a child in the care of another, even if prolonged, does not constitute abandonment of the child if the parent remains in contact with the child and demonstrates an intent to maintain the relationship. See SMR, 982 P.2d at 1247-49 (guardians failed to present clear and convincing evidence that child left in their care for approximately three and one-half years had been abandoned by mother; mother remained in infrequent, but continuing, contact with the child throughout the period; she had initiated proceedings to terminate the guardianship on one occasion; and she had later sought advice regarding the restoration of her custody of the child); see also In re D.I.S., 249 P.3d 775 (Colo.2011).
As the Utah Supreme Court observed in Wilson v. Pierce, 14 Utah 2d 317, 383 P.2d 925, 928 (1963):
A distinction should be made between leaving a child under circumstances which show a continuing intention to fulfill the duties of parenthood by seeing to it that the child is cared for and of possibly resuming such responsibility if that becomes necessary; as distinguished from an intent to completely and permanently abandon a child and parental responsibilities to it.
When the record shows that the parent attempted to maintain contact with the child, the record does not support a finding that the parent intended to abandon the child, even if the parent's actual contact with the child was limited or nonexistent. See J.A.V., 206 P.3d at 469 (court failed to properly apply the definition of abandonment when it ignored father's efforts to obtain parenting time with his child; although protective orders prohibited father from contacting the child and limited his right to contact mother concerning the child, the record demonstrated that he did not intend to abandon his rights with respect to his child).
Here, the record shows that the child was initially placed in Ms. Crawford's care when she offered to take him and his brother in after father brought them to Denver. Both father and mother subsequently signed documents purporting to give guardianship of the children to Ms. Crawford, but neither stated that the arrangement was intended to be permanent. Mother, the custodial parent, indicated in her statement that she had been ill, that she knew that the children would receive good care from Ms. Crawford, and that she was in communication with the children "on a weekly basis." Two and one-half years later, after Ms. Crawford filed a motion seeking an allocation of parental responsibilities for S.M.J.C., mother testified that she had intended only to grant temporary guardianship to Ms. Crawford; that she now wished to vacate the guardianship letter; and that she lived on the reservation and wanted to raise her children, including S.M.J.C., on the reservation.
Ms. Crawford testified that although she had originally thought that her care of S.M.J.C. would be temporary, she had begun to think that it might not be temporary after about six months. She noted that "nobody ever talked about taking him back because [she] was seeing to all of his medical stuff." She noted in addition that mother had never visited the child in Denver, that neither parent had sent him presents for birthdays or Christmas, and that, with the exception of a few minor cash gifts, neither parent had provided financial support for him.
We conclude that the evidence falls well short of proving that S.M.J.C. had been abandoned. The evidence suggests, rather, that after the child was left in Ms. Crawford's care by father, Ms. Crawford never requested that he be removed, and mother, who had legal responsibility for the child as his custodial parent, chose to allow the child to remain in Denver, where he was receiving excellent care. Ms. Crawford acknowledged that while the child was in her care, there was telephone contact between the child and members of his family, and between her and mother. She testified that she was no longer *964 willing to call mother because mother had been "pretty angry" during their last conversation. Although she did not reveal the cause of mother's anger, we note that Ms. Crawford stated in an affidavit filed in support of her motion for a temporary allocation of parental responsibilities that mother had told her that she planned to remove the child from Colorado and she had attempted to transfer his school records out of state. This statement, in conjunction with mother's testimony, clearly indicates that mother did not intend to relinquish her parental responsibilities with respect to S.M.J.C.

3. S.M.J.C.'s Domicile is the Domicile of His Custodial Parent
Because the evidence does not show that the child was abandoned, his domicile is not that of his caregiver, Ms. Crawford. Rather, as the child of divorced parents, his domicile is "the same as that of the parent to whose custody he has legally been given." Restatement § 22 cmt. d. Mother testified that the tribal court had given her custody of S.M.J.C., and documentary evidence presented to the court supports her claim. Accordingly, the child's domicile is the same as mother's domicile.
The order denying the motion to dismiss is vacated, and the case is remanded. On remand, the trial court shall make findings regarding the domicile of the child's custodial parent, mother, at the inception of these proceedings. The court may conduct an additional hearing before making such findings if the court believes that additional evidence is needed to decide the issue. If the court determines that mother was domiciled on the reservation, then the court shall grant the motion to dismiss, and the proceedings shall be transferred to the Oglala Sioux Tribal Court. If the court determines that mother was not domiciled on the reservation, then the court may reinstate its order denying the motion to dismiss subject to a renewed appeal by ONTRAC.
Judge RUSSEL and Judge MILLER concur.
NOTES
[*] Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2010.